## GENERAL FOODS CORP. et al. v. UNITED STATES et al.

United States District Court
S. D. New York.

Jan. 3, 1952.

Lawrence W. McKeown, New York City, proctor for libellants.

Myles J. Lane, U.S.Atty., and Gay & Behrens, New York City, proctors for respondents. Edward J. Behrens, New York City, advocate.

630

CLANCY, District Judge.

### Findings of Fact.

1. Libellant, General Foods Corporation, is the purchaser and owner of bills of lading for a quantity of cocoa beans delivered in good order and condition at Port Bouet aboard the United States owned S.S. Thomas Haywood, in September, 1946, for carriage to New York.

2. The libellant's cocoa beans which altogether exceeded 7,800 bags were put in No. 3 lower hold and the 'tween deck compartments of holds Nos. 2, 3, 4 and 5. Before taking the cocoa aboard the ship had loaded lower holds Nos. 1, 2, 4 and 5 and No. 1 'tween decks as well with logs which were towed some distance through the water before being put aboard. The cocoa beans above the hatch coaming were laid on cocoa mats and cocoa mats lined the walls put there as the cargo was stowed. There was no dunnage. There were air channels or "breeze holes" in the stow made by the stevedores somewhere along the sides or in the corners as they stowed the beans. These should be beneath the coaming: They serve the cargo only when the hatch covers are removed.

3. The Thomas Haywood was a liberty ship and her large ventilators are set at the junctures of holds Nos. 1 and 2, 2 and 3 and 4 and 5, to accommodate both adjoining holds. Cargoes of cocoa beans had been carried in liberty ships before the shipment involved here. Some sweat damage was ordinarily incurred in these voyages. Most of it was said to have been curable on arrival.

4. The weather at Port Bouet, when the cocoa beans were put aboard, was humid but the mate insisted none were put aboard in rain. The Thomas Haywood enjoyed unusually fair weather on her voyage from Port Bouet which she left on September 24 to New York where she docked October 9th. Temperatures varied from 68 to 80 degrees and some days the variance narrowed to a few degrees. Her hatches were never opened. On the day before she reached New York she struck her only spell of foul weather. The thermometer on that day descended to 55°. The wind blew a small gale and carried enough spray to warrant the covering of the ventilators. They remained covered thereafter.

5. During the voyage the officers and the crew were aware of the probability that a strike of some maritime union or unions would be met upon the ship's arrival. That a strike of some kind was being waged was told them by the pilot taken on at Sandy Hook. Five hours elapsed before reaching the pier but neither ship nor cargo received any attention. Both crew and officers left the ship on the day of arrival. Some returned for their personal effects on the day after but did nothing aboard. On October 28 a new mate boarded the ship and on the 29th a new captain. Other than those items no evidence appears of what happened to or aboard the ship until November 4 when the stevedores began to unload. Neither is there evidence of what resources if any were available to respondent to care for the cargo or why any was unavailable.

6. During the voyage of The Thomas Haywood the third mate did nothing and paid no attention to his duties. He did not even make entries in the log other than to note the prevalence of fair weather. He was wholly incompetent. All of the entries describing the attempted ventilation of the cargo were made by the first mate who trimmed all ventilators alee during his watches. All the surveyors who were certified mates as well agreed that to procure circulation in the holds some should be trimmed to the wind.

7. When the cargo of cocoa beans was outturned November 9th and thereafter, about six hundred bags were found to be so damaged by fresh water as to be a total loss. The damage and certainly the wetting in some part antedated the ship's arrival in New York. Detention in the unventilated holds during the weeks at the dock produced more mildew and rotted bags but fresh water damage was incurred before arrival.

8. The damage resulted from the respondent's negligence in failing properly to ventilate the cargo of cocoa beans during the voyage to New York, a task that required continuous attention in a liberty ship.

where the ventilators are at best barely sufficient.

### Conclusion of Law.

1. The libellant is entitled to judgment for its entire claim.

■ The first point made by the respondent is that the libellant was under an obligation to prove the good condition of the cargo at the time of its delivery to the ship. See The Neil Maersk, 2 Cir., 91 F.2d 932. There are several answers to this contention. The first is that it was never mentioned during the trial, throughout which respondent relied on sweat which was called a peril of the sea and a seamen's strike as excuses for the bad condition of a cargo that was apparently accepted as having been good when taken aboard. But the evidence fully sustains a finding that the cocoa beans were in good condition when delivered to the vessel. Warner Barnes & Co. v. Kokosai Kisen Kabushiki Kaisha, 2 Cir., 102 F.2d 450. The mate testified that he was instructed by the ship's agent at Takoradi "to make sure it would be dry", referring to the cocoa beans cargo. No one asked the mate directly whether or not he made sure the cargo was loaded dry but he said he had watched the stow at Port Bouet. Furthermore, the damage done to the cocoa beans was found only in the top tiers in all the holds.

■ As to the evidence concerning the strike, nothing more was proved than that a strike of a Seamen's Union occurred. How long it lasted, why no resources were available to the respondent during it to care for the cargo, what conditions of weather were required to be borne, whether or not any care tender was on the vessel or on the dock, or what his duties were if one were present or even what if anything he was able to do does not appear. We can take judicial notice of no more than the respondent's inability to unload the cargo because of the maintenance of a picket line which was referred to as present on the day after the ship's arrival. It is respondent's burden to prove that the strike disabled it from giving the cargo the required attention and thereby constituted a cause of damage. 46 U.S.C.A. § 1304; Schnell v. The Vallescura, 293 U.S. 296, 55 S.Ct. 194, 79 L.Ed 373.

■ All the surveyors agreed that the cargo suffered sweat damage before its arrival at New York. Respondent excused this damage as caused by a peril of the sea. "Sweat * * * can be regarded as a peril of the sea only when all available and reasonable precautions are taken to avoid it. * * * The carrier remains liable if it fails to provide, without excuse, sufficient ventilation, or if its improper stowage contributes to the sweat, or if it is otherwise negligent in handling the cargo." Wessels v. The Asturias, 2 Cir., 126 F.2d 999, 1000. The Thomas Haywood on its trip from Port Bouet to New York was favored by exceptionally good weather. There were occasional showers and some overcast but generally fair, calm weather was enjoyed throughout eighteen of the nineteen days of the voyage. On none of these days were the hatches raised to ventilate the cargo of cocoa beans. Granted that on some the temperature variances were not pronounced, this cargo required ventilation at all times. The testimony is that the "breeze holes" established in the formation of the stow served their purpose only when the hatch covers were lifted in fair weather. In four of the five lower holds and in No. 1 'tween decks were carried logs which were towed to the vessel at a port in Africa and which were consequently wet when lifted into the holds. The large ventilating shafts on The Thomas Haywood are made to serve both of the adjoining holds between which they descend in the ship. The moisture from the log cargo could escape only through these ventilators. One of the surveyors, and we incline to agree with him, said that these logs, wet at least when loaded, would supply moisture that would be disseminated in the 'tween decks as the lower hold air content sought escape through the ventilators. We believe sufficient pressure would be exercised by the outside air to cause at least some of the damp air from the lower holds to penetrate into the 'tween decks escapes from the ventilator shafts. To what extent this is true appears to the Court a guess and we will go no further than to hold that the presence

of the log cargo imposed the duty of the utmost care to ventilate the holds on this ship whose ventilators respondent's surveyor said were "barely adequate" for the holds even when the hatches were opened in fine weather. The comparatively light damage in lower No. 3 testified to by the surveyors, however much of it may be attributable to the steadiness of the ocean temperature, to an extent confirms this. As a matter of fact if we can believe the log, the ventilators all were always trimmed alee, a trim that the surveyors agreed prevented proper circulation in the holds. The only entries made about the use of the ventilators were made by the careful but not too experienced first mate. What use of them, if any, was made or what care was devoted to their proper operation during the watches of the other mates no one knows. The third mate was denounced as wholly unfit and one who paid no attention whatever to his duties.

On the day before the ship reached New York she met with the only rough weather of the voyage. It grew colder, the wind blew a small gale and the sea was somewhat rough. The ventilators were covered to avoid the entry of spray. It appears to be the respondent's theory that these twenty-four hours of the voyage explain everything because of the high probability that ship's sweat then wet the cargo. On the little evidence in this case which was nothing more than the log entries of air temperature this seems to the Court largely an assumption. And that assumption accepts as a fact a great quantity of moisture in the air in the hold on that day and a high temperature there as well. If these two circumstances existed as a fact their being was directly due to the lack of ventilation during the voyage in the face of the reasonably expectable cooler weather that was finally encountered and its reasonably expectable disastrous effects. The failure to ventilate throughout the fair weather days that preceded this one day of rough weather cannot be ignored.

 It appears therefore that the respondent's failure to ventilate the cargo during the trip from Africa to New York was the efficient cause of its damaged condition when outturned. Failure to ventilate is a failure to care for the cargo and not a matter of the ship's management. Philippine Sugar Centrals Agency v. Kokusai Kisen Kabushiki Kaisha, 2 Cir., 106 F.2d 32, at page 36. It was respondent's duty to show any increase in the damage suffered during the voyage that ensued in port and was attributable to the strike as an additional cause. This it has failed to do.