**Heinrich C. HORN, Claimant of the M/S HEINZ HORN, Appellant,**

v.

**CIA de NAVEGACION FRUCO, S. A. and J. R. Atkins, d/b/a Alabama Fruit and Produce Company, Appellees.**

**CIA de NAVEGACION FRUCO, S. A. and J. R. Atkins, d/b/a Alabama Fruit and Produce Company, Appellants,**

v.

**Heinrich C. HORN, Claimant of the M/S Heinz Horn, Appellee.**

**No. 22167.**

United States Court of Appeals Fifth Circuit.

Nov. 5, 1968.

Certiorari Denied April 1, 1969.
See 89 S.Ct. 1272.

John H. Tappan, Mobile, Ala., for appellants.

Rae M. Crowe, W. Boyd Reeves, Mobile, Ala., for appellees.

Before RIVES, GEWIN and GODBOLD, Circuit Judges.

RIVES, Circuit Judge:

Upon petitions for rehearing filed by the respective parties, the original opinion and decision of this Court are withdrawn and changed so as to read as hereinafter set forth. In other respects the petitions for rehearing are denied.

Substitute Opinion and Decision

All parties have appealed from the decree rendered in four consolidated ad-

miralty cases.[1] These disputes arose from the time charters of two sister ships for the transport of bananas, and the subsequent delivery of some parts of the banana shipments in excessively ripened condition.

Cia de Navegacion Fruco, S.A. (Fruco) chartered from Heinrich C. Horn (Horn) two refrigerated vessels for the carriage of bananas between Ecuador and the Gulf Coast of the United States. The M/S HEINZ HORN was chartered April 30, 1962, under a time charter patterned after the New York Produce Exchange Charter Party.[2] A similar time charter was executed by the same parties, on May 15, 1962, affecting the M/S MARIE HORN. J. R. Atkins, president of Fruco, and its principal shareholder is guarantor for Fruco on both charters.

Two libels for cargo damage arose from two of the voyages under the HEINZ HORN charter, voyage no. 1 and voyage no. 4. That vessel was delivered under charter to Fruco on June 3, 1962, at Mayaguez, Puerto Rico. She proceeded to Puerto Bolivar, Ecuador, to commence her initial voyage under the charter. En route to Puerto Bolivar, pursuant to Fruco's request, the vessel took on Daniel Christian, Fruco's representative, who was inexperienced in the banana trade and who was placed on board the HEINZ HORN to observe and to learn.

The vessel arrived in Puerto Bolivar June 10, 1962. Loading of bananas commenced June 11 and was completed early on June 13, under the supervision of Chief Mate Schultz. Apparently no cargo other than bananas was loaded. The master of the vessel, Captain Rudolph Horn, signed two clean bills of lading for the cargo on June 12, 1962. Atkins, doing business as Alabama Fruit and Produce Company (Alabama Fruit) had previously furnished letters of credit covering this cargo and the sale was completed, f. o. b. Ecuador, on June 12, 1962.

The HEINZ HORN sailed from Puerto Bolivar early on the morning of June 13, directed toward Mobile, Alabama, with its cargo consigned to Alabama Fruit. Captain Horn left the ship at the Panama Canal due to illness; Chief Mate Schultz became acting master. He and the second mate were thereafter the only officers aboard; a normal complement of officers was a captain and three mates.

The vessel docked in Mobile on the night of June 21. When unloading commenced the next morning, many of the bananas were found to be ripe or ripening to such an extent that they were of no use to the importer. The greater damage was in the number two hold where the bananas had been packed in boxes. Damage was less severe in the number one hold, where the bananas had been stowed by the stem, as well as in boxes.

Under the terms of the charter party, the HEINZ HORN was to sail on the orders of Fruco, the charterer. Fruco did not issue a sail order to depart from Mobile until June 29. During the period between unloading of the cargo from voyage no. 1 and that re-sail date, the vessel went on dry dock for inspection for slightly more than one day; the dry-dock time admittedly was at the expense of Horn, as owner. Upon arrival in Puerto Bolivar for the second voyage, the HEINZ HORN stood by for two days awaiting bananas for loading. The vessel's delay in leaving Mobile occasioned the absence of any bananas ready for loading in Ecuador. Fruco has treated those two days, as well as the period after arrival in Mobile, as being a period of off-charter, and it has declined to pay the charter hire for those times, amounting to a total of $5,594.39. Additionally, Fruco and Atkins, its guarantor, have withheld payment of charter hire in the

1. Cia De Navegacion Fruco, S.A. v. M/S HEINZ HORN, et al., S.D.Ala.1964, 233 F.Supp. 637.

2. See Gilmore & Black, Admiralty, Appendix C, 802 (1957), (hereinafter cited as Gilmore & Black).

amount of $25,946.76, as a result of Atkins' claim for bad cargo.

The events surrounding the second, third and fifth voyages of the HEINZ HORN under Fruco's charter produced no issue for this litigation.[3] Voyage no. 4 produced another delivery of excessively ripened bananas to Atkins, d/b/a Alabama Fruit. The HEINZ HORN was loaded with bananas at Guayaquil, Ecuador, on September 2 and 3, 1962. This shipment of bananas was loaded by the stem; none were in boxes. Both holds were utilized. The masters of the vessel at that time, Captain Heinz Freytag, rejected a large number of bananas brought to the ship, on the ground that they were too far along in the ripening process to be shipped. Captain Freytag signed a clean bill of lading for 8,170 stems, consigned to Alabama Fruit, and the ship sailed the morning of September 3. En route to Mobile, some two days out from Guayaquil, the master jettisoned 335 stems of bananas, after inspecting the holds and finding these stems to be so far along in the ripening process as to "infect" the remainder of the cargo.

The HEINZ HORN docked in Mobile on September 11. Unloading commenced the following morning. Many stems of bananas were found to be too ripe to sell. The remaining bananas were sold at a reduced rate due to their ripened condition.

The HEINZ HORN made one further voyage under the charter with Fruco. On September 21, 1962, Alabama Fruit, through Atkins, notified Horn's agent that it felt "it best for you to take the ships back and cancel the charter at the end of the present voyage." In that letter, Atkins referred to a telephone conversation to that effect between himself and Horn's agent, purportedly held that same day. Subsequently, Fruco sent a confirmation telegram to the Horn agents.[4]

The MARIE HORN was redelivered to the owner on September 27; she had been chartered for a minimum period of four months, or until November 12, 1962. Thus her redelivery was some 46 days prior to the expiration of the minimum time. The HEINZ HORN charter was for a minimum three-month period, which expired September 3. Redelivery of that vessel to the owner was effected October 3. HEINZ HORN went on hire for another charter October 4. MARIE HORN had been booked September 3 for delivery to another charterer October 1.

Libel was filed by Fruco, as charterer, against HEINZ HORN and Horn with regard to the first voyage. Atkins, d/b/a Alabama Fruit, subsequently joined in that libel. Atkins filed a similar libel against the same respondents with regard to voyage no. 4, to which Fruco was added by amendment as a party libelant. Horn filed two separate libels, as owner of the HEINZ HORN and of the MARIE HORN, respectively, seeking charter hire allegedly due on each vessel. In connection with the first libel, filed as a result of voyage no. 1, the HEINZ HORN, after being put under seizure, was released under bond of $40,000.

The district court, after consolidation, awarded Atkins $31,261.64 for cargo damage resulting from voyage no. 1, and $18,495.73 for cargo damage with regard to voyage no. 4, or a total of $49,757.37.

---

3. However, see n. 11, infra, for the high percentage of ripe and turning bananas on those voyages.

4. The telegram, charged to "Ala. Fruit & Produce Co.," reads as follows:
"IN ACCORDANCE WITH OUR PHONE CONVERSATION SEPTEMBER 21ST AND LETTER SAME DATE HAVE DEFINITELY DECIDED VESSELS MARIEHORN AND HEINZHORN NOT SUITABLE FOR TRADE INTENDED AS PER CHARTER PARTIES DATED MAY 15TH AND APRIL 30, 1962 RESPECTIVELY STOP MARIEHORN UNLOADED YESTERDAY EXCESSIVE RIPES WHICH SAME UNSATISFACTORY EXPERIENCE PREVIOUS CARGOES BOTH VESSELS THEREFORE ACCEPT THIS OUR INTENTION NOT TO USE THESE VESSELS FURTHER.
CIA DE NAVEGACION FRUCO SA"

Horn was awarded a total amount of $30,864.71. This included $25,946.76 for charter hire withheld as security for cargo damage on voyage no. 1, $3,651.29 for charter hire for time HEINZ HORN was tied up in Mobile after voyage no. 1, and $1,266.66 for charter time due for the two days HEINZ HORN lay awaiting cargo in Puerto Bolivar prior to voyage no. 2. Interest of 6% per annum was granted on each award, to date from relevant dates. All parties have appealed. We affirm in part and reverse in part.

## I.

The delicate nature of bananas necessitates special care in transportation. Bananas customarily are cut in a hard green state and are shipped under such refrigeration as will delay the ripening process. The ripening temperature for bananas is generally a pulp temperature of 60 to 62 degrees Fahrenheit. Banana shippers regard a transport temperature of 53 to 55 degrees Fahrenheit as appropriate. Temperatures below 52 degrees Fahrenheit have a deleterious chilling effect on the fruit. The general effort is to transport the bananas at a low temperature, retarding the ripening process, but safely above the level at which the fruit is chilled.

The ripening process of the banana produces several effects on the fruit, including a color change from grass green to yellow, and, ultimately, to brown. Ripening bananas exude, inter alia, ethylene gas and heat, both of which tend to accelerate the ripening of other bananas in proximity. See Lucayan Transports v. McCormick Shipping Corp., 5th Cir. 1951, 188 F.2d 202, 204.

For all of these reasons, a ship properly equipped to transport bananas will provide stowage holds cooled by a refrigeration system which maintains a properly low temperature and which exhausts the heat and gases that encourage ripening.

Usually, prior to taking on a load of bananas, the carrier ship will cool its holds to an appropriate temperature. The cooling system may sometimes be operated during loading, even with the hatches open. Once loading is completed and the hatches are closed, the ship is expected to "pull down" the hold temperature and that of the bananas to the necessary level within approximately eight hours. The maintenance of the proper temperature thereafter depends on a close control of the temperature of air delivered into the hold, and of that exhausted. Delivery air normally should be at a level of 52 to 53 degrees. The temperature of the exhaust air apparently is controlled, in part, by the frequency with which the air in the hold is changed. A de-gassing process is used to ensure exhaust of the ripening gases.

■■ Maritime law infers a general warranty of seaworthiness from a charter-party agreement even where such warranty is not expressly made. The Caledonia, 1895, 157 U.S. 124, 15 S.Ct. 537, 39 L.Ed. 644; Work v. Leathers, 1878, 97 U.S. 379, 24 L.Ed. 1012; Jordan, Inc. v. Mayronne Drilling Mud, Chemical & Engineering Service, 5th Cir. 1954, 214 F.2d 410. The term "seaworthiness" is read to mean, inter alia, fitness for the use anticipated. See The Southwark, 1903, 191 U.S. 1, 24 S.Ct. 1, 48 L.Ed. 65.

■■ A similar warranty of seaworthiness at one time was read into contracts of carriage or bills of lading. The Carriage of Goods by Sea Act of 1936 (COGSA), 46 U.S.C. § 1300, et seq., abolished that general warranty with regard to the carrier-shipper relationship governed by bills of lading. Instead, the carrier is statutorily obligated to use due diligence to make the vessel seaworthy. 46 U.S.C. § 1303(1). Such obligation is either met or not met when the vessel "breaks ground" on the voyage. The Steel Navigator, 2nd Cir. 1928, 23 F.2d 590; Erie & St. Lawrence Corp. v. Barnes-Ames Co., W.D.N.Y.1931, 52 F. 2d 217.[5] No such statute regulates the

5. In part, at least, COGSA is closely similar to the Harter Act of 1893, 46 U.S.C. §§ 190–196, so that cases interpreting the latter often have applicability to COGSA.

terms of private charter parties, and risks of damage may be adjusted in any manner specified by the charter. See The Monarch of Nassau, 5th Cir. 1946, 155 F.2d 48; Gilmore & Black, at 181.

As was the situation here, the owner and the charterer sometimes chose to incorporate COGSA into the charter party.[6] Such a practice serves to cut the general seaworthiness warranty "down to COGSA dimensions," that is, to the level of due diligence. Gilmore & Black, 182 n. 41, 183. See Cooper v. Pinedo, 5th Cir. 1954, 212 F.2d 137; Ore S. S. Corp. v. D/SA/S Hassel, 2nd Cir. 1943, 137 F.2d 326.

█ The charter party in each case made specific reference to certain characteristics, specifications and capacities of the ships. The statements may reasonably be treated as warranties, the breach of which would entitle Fruco, as charterer, to avoid the agreement entirely or to sue for damages arising from the breach. Davison v. Von Lingen, 1885, 113 U.S. 40, 58 S.Ct. 346, 28 L.Ed. 885; Romano v. West India Fruit & S. S. Co., 5th Cir. 1945, 151 F.2d 727, 731; Simonetti v. Foster, D.Mass.1880, 2 F.

415. We have found no authority which would indicate any limitation on obligations under such express representation through the advent of COGSA by incorporation. Cf. Luckenbach v. W. J. McCahan Sugar Refining Co., 1918, 248 U.S. 139, 149, 150, 39 S.Ct. 53, 63 L.Ed. 170. That question need not be decided here because, as presently developed, in this case the charterer stood in the same position as the cargo owner.

█ COGSA, in effect, limits the potential liability of the ship or its owner in the instant case. The recovery of Fruco, the charterer, from Horn or his ship is limited to the level of recovery which Fruco is found to owe the owner of the cargo, in this case Atkins, consignee and successor to the shipper. See The Toledo, 2nd Cir. 1941, 122 F.2d 255, aff'g, The Toledo, E.D.N.Y.1939, 30 F.Supp. 93, 98. Certainly Fruco should be allowed no recovery for loss it has not suffered, and its own potential loss is measured by that recovery which it may owe to Atkins.[7] Fruco's responsibility to Atkins is, in turn, established by the terms of the bills of lading. COGSA governs the relationship here

---

Gilmore & Black, at 127. See, e. g., The Bill, D.C.Md.1942, 47 F.Supp. 969, aff'd Lorentzen v. Brazil Oiticica, Inc., 4 Cir., 145 F.2d 470. But see text following text at n. 12, infra.

**6.** "44. New Jason Clause, New Both-to-Blame Collision Clause, Chamber of Shipping War Risk Clause 1 & 2, U.S.A. Clause Paramount, as attached, to be fully incorporated in this Charter Party.

\* \* \* \* \*

"U.S. Clause Paramount

"This Bill of Lading shall have effect, subject to the provisions of the Carriage of Goods by Sea Act of United States approved April 16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under the said Act. If any term of this Bill of Lading be repugnant to said Act to any extent, such terms shall be void to that extent, but no further."

**7.** We thus avoid the broad question whether bills of lading generally are to be considered as contracts between shipper and time charterer, Benner Line v. Pendleton, 2nd Cir. 1914, 217 F. 497, 499; Burn Line v. United States, & A. S.S. Co., 2nd Cir. 1908, 162 F. 298, 300; Jebsen v. A Cargo of Hemp, D.Mass.1915, 228 F. 143, 148; British & Foreign Marine Ins. Co. v. Kilgour S.S. Co., S.D.N.Y.1910, 184 F. 174, 178; or between shipper and owner, Field Line (Cardiff), Ltd. v. South Atlantic S.S. Line, 5th Cir. 1912, 201 F. 301, 304, citing The Schooner Freeman v. Buckingham, 1855, 59 U.S. (18 How.) 182, 189, 15 L.Ed. 341. See Poor, Charter Parties § 10 (4th ed.). The cases cited were not dependent on a matter of statutory liability, and its effect on the relationships of the parties.

Since Horn has repeatedly asserted an absence of privity with Atkins, we are unable here to use the rationale of Cooper v. Pinedo, 5th Cir. 1954, 212 F.2d 137, 143, where we noted that counsel for both parties had understood that the issue of liability was to be determined from the original charter agreement.

created by that document, 46 U.S.C.A. § 1300, and the terms of COGSA may not be modified by agreement of the parties. 46 U.S.C.A. § 1305.

## II.

## VOYAGE NO. 1

With regard to the first voyage of the HEINZ HORN the district court found:

"The ripened state of the bananas was due to the high pulp temperatures at which they had been transported. The *primary cause* of the high pulp temperatures was the improper stowage of the boxes of bananas.

"In the No. 2 hold the cartons of bananas were tightly stowed. No slots, bin boards or dunnage had been used to facilitate the flow of air between the cartons. The cartons were stowed an average of eight tiers high in both compartments of the No. 2 hold. No space was left between the cartons.

"A *factor which contributed* to the ripening of the bananas was the excessive length of time taken in pulling down the temperature of the delivery temperature.

"The bananas were packed in boxes or cardboard cartons designed for and used in the transporting of bananas. These cartons were well ventilated and their construction in no way caused or contributed to the damage done to the bananas." 233 F.Supp. 637, 640 (emphasis supplied).

■ We agree with these determinations of the district court and find they are not clearly erroneous. See Fed.R.

Civ.P. 52(a).[8] Indeed, in the findings quoted above, the only matter over which there could be disagreement is with regard to the time taken to lower the hold temperatures, and the maintenance thereafter of the proper temperatures. Since a higher percentage of the bananas in hold no. 1 survived under the same refrigeration system, the method of stowage may have affected the ship's capacity to care for its cargo. We note, however, that Arthur Grant, a naval architect and marine surveyor, called by libelants[9] as an expert witness, testified at length as to his readings of the ship's temperature logs. He concluded that, with regard to hold no. 2, the delivery air temperature steadied down to 53 degrees Fahrenheit in approximately 36 hours, whereas an 8-hour period was the proper time. He stated further that the return air never steadied at or below 55 degrees Fahrenheit, while the appropriate level would have been between 53 and 54 degrees. Whether these effects resulted from the capacity of the system itself, or from the manner in which it was operated, he did not say. The district court concluded that the latter element, method of operation, was at fault. 233 F.Supp. at 642.

Our disagreement with the result reached in the district court as to voyage no. 1 stems from the path followed to its conclusion that liability for the "primary cause" and contributing "factor" rests with Horn, as the "carrier."

From Atkins' view, the charterer and the owner are indistinguishable. It is not for Atkins to separate their responsibilities under the charter party, a document in which he did not participate except as a guarantor. However, Fruco may have recovery over against the vessel or its owner as a result of the

8. See also McAllister v. United States, 1954, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20; C. J. Dick Towing Co. v. The Leo, 5th Cir. 1953, 202 F.2d 850, 854; River Terminals Corp. v. Southwestern Sugar & Molasses Co., 5th Cir. 1960, 274 F.2d 36, 37.

9. For convenience, we refer to Fruco and Atkins as libelants and to Horn as respondent.

charter-party terms. Thus we actually are concerned with Atkins' recovery through Fruco but ultimately against Horn.[10]

■ The district court concluded that the HEINZ HORN was seaworthy. We do not agree. While we would sustain its conclusion to the extent of the mechanical fitness of the vessel,[11] based on the testimony of the expert witnesses summoned by all parties, we conclude that the ship was unseaworthy with respect to its crew.

"Seaworthiness is a relative term depending for its application upon the type of vessel and the character of the voyage. The general rule is that the ship must be staunch and strong and well equipped for the intended voyage. And she must also be provided with a crew, adequate in number and competent for the voyage with reference to its length and other particulars, and have a competent and skilled master of sound judgment and discretion."

The Framlington Court, 5th Cir. 1934, 69 F.2d 300, 304. From the record, the following is more than apparent:

(1) The Captain, Rudolph Horn, was ill, did not supervise loading, and left the vessel before the end of the voyage.

(2) At no time during the voyage did the vessel have the normal complement of officers.

(3) The officers had no experience with boxed bananas.

(4) For officers, once the Captain left the ship at the Canal Zone, the vessel had only two mates, one of whom had limited sea experience.

(5) The Acting Master had had prior experience as the Captain of a refrigerated vessel.

■ Faced with such evidence, we conclude that the HEINZ HORN was not seaworthy with regard to its personnel. The owner bore the burden of proving the exercise of due diligence to

10. This court has observed that, "regardless of whether libelants, as sub-charterers, may claim privity of contract with the owners sufficient to maintain an action *in personam*, they are still entitled to maintain the present *in rem* suit against the vessel for damages to the cargo." Cooper v. Pinedo, 5th Cir. 1954, 212 F.2d 137, 142; Perez v. Cia Tropical Exportadora, 5th Cir. 1950, 182 F.2d 874, 875.

The procedure we follow does no injustice to the shipowner.

"The general owner must be taken to know that the purpose for which the vessel is hired, when not employed to carry cargo belonging to the hirer, is to carry cargo of third persons; and that bills of lading, or charter parties, must, in the invariable regular course of that business, be made, for the performance of which the law confers a lien on the vessel."

The Schooner Freeman v. Buckingham, 1856, 59 U.S. (18 How.) 182, 190, 15 L. Ed. 341; Perez v. Cia Tropical Exportadora, 5th Cir. 1950, 182 F.2d 874, 875.

11. The testimony indicated that subsequent voyages of the HEINZ HORN under this charter party produced the following percentages of ripe and turning bananas:

| No. 2 | 17.51% |
| No. 3 | 26.99% |
| No. 4 | 56.00% |
| No. 5 | 28.79% |

The normal and expected percentage is from 3% to 5%. The testimony was that 10% is regarded as excessive. While the actual results could be regarded as indicative either of a condition of unseaworthiness or of failure to use due diligence to make the vessel seaworthy, as well as of failure properly to operate the refrigeration mechanism, the district court inferred the last explanation as the source of trouble, rather than the condition of the equipment.

The fact that Fruco's witness Grant testified that the HEINZ HORN'S refrigeration plant was overhauled after the fourth voyage, and that on the fifth voyage the delivery air stayed at 52 degrees "almost perfectly," does not necessarily lead to the conclusion that prior to that overhaul the owners had failed to use due diligence in providing a properly-equipped vessel. In fact, that overhaul apparently did not have a great effect on the comparatively high percentage of damaged bananas.

make the vessel seaworthy. J. C. Penney Co. v. American Express Co., S.D. N.Y.1952, 102 F.Supp. 742, aff'd, 2nd Cir. 1953, 201 F.2d 846. Such proof does not appear in the record. We conclude, Continental Insurance Co. v. United States, 2nd Cir. 1952, 195 F.2d 527, 528, that the owner failed to exercise due diligence to make the vessel seaworthy at the start of the voyage by not insuring that adequate and competent personnel would remain on board through the voyage. International Nav. Co. v. Farr & Bailey Mfg. Co., 1901, 181 U.S. 218, 21 S.Ct. 591, 45 L.Ed. 830; *The Framlington Court,* supra.[12]

■■■■ Under the Harter Act, supra, n. 5, the owner whose diligence in providing a seaworthy vessel is found deficient is liable for damage to cargo without causal relation between the defect and the disaster. The Framlington Court, supra, 69 F.2d at 307. COGSA, however calls for such causal relation as a prerequisite to a finding of liability. Although § 1303(1) (a), supra, n. 12, makes the exercise of due diligence obligatory, § 1304(1) n. 21, infra, has been construed as requiring that the loss be causally related to the want of due diligence before liability can be imposed on the carrier. See The Vale Royal, D. C.Md.1943, 51 F.Supp. 412, 424; Gilmore & Black, at 130. This view is reinforced by reference to a comparison of COGSA with its predecessor:

"The principal difference between the Harter Act and the Hague Rules or Carriage of Goods by Sea Act is that the negligence or exception clause of the Harter Act—Section 3—is conditional; it never operates to exonerate the carrier unless due diligence has been used to make the ship seaworthy *in all respects,* regardless of

causal connection, whereas the exception clause of the Act of 1936—Article 4 [§ 1304]—is positive; it always operates to exonerate the carrier unless due diligence has not been used in some respect proximately causing or contributing to the loss."

1 Benedict, Admiralty, § 96, at pp. 291–92 (Knauth ed.)

The manner in which the cooling sys-was operated stemmed from the unseaworthy character of the vessel. Whether the link of the causal chain is manifested by the numerical inadequacy of the crew, or in the want of proper training and instruction is not material, since the owner has failed to carry its burden of proving an absence of causation between the unseaworthiness and loss. See Cooper v. Pinedo, 5th Cir. 1954, 212 F.2d 137, 143; Eppens, Smith Co. v. Silver Line, 5th Cir. 1942, 128 F.2d 882, 883. We need not consider at this point any potential exculpation offered by the Refrigeration Clause, quoted n. 15, infra, since that clause by its own terms is not operative where, as on this voyage, there was a want of due diligence to make the vessel seaworthy.

■■■■ The other and primary cause of damage on the first voyage, as found by the district court, was the improper stowage of the bananas. 46 U.S.C. § 1303 provides in part:

"(2) The carrier shall properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried."

Neither the carrier nor the ship is responsible for loss resulting from a "cause arising without the actual fault or privity of the carrier and without the fault or neglect of the agents or servants of the carrier." § 1304(2) (q).[13]

12. § 1303: "(1) The carrier shall be bound, before and at the beginning of the voyage, to exercise due diligence to—
 "(a) Make the ship seaworthy;
 "(b) Properly man, equip, and supply the ship * * *."

13. § 1304(2) (q): "Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from—
 * * * * *
 "(q) Any other cause arising without the actual fault and privity of the

Horn, the owner, rather than denying the causal effect of the improper stowage of the bananas, has argued that Fruco, the charterer, was responsible for the stowage. We note that COGSA places stowage responsibility on the "carrier." We do not decide that, when COGSA is incorporated into a charter party, the term "carrier" in § 1303(2) refers to the owner and not to the charterer, although such a use of the Act may well be proper. Instead, we regard COGSA, through its statutory control over the bills of lading herein, as momentarily placing stowage responsibility on Fruco, the "carrier" from the standpoint of the cargo, its shipper and its consignee. We then turn to the charter party to ascertain the party responsible for stowage of the cargo under that document, as between the owner and the charterer.

The charter party placed all loading spaces and loading equipment at the disposal of the charterer. That person in turn was obligated to furnish the Captain with "all requisite instructions and sailing directions." Horn, the owner, accepted responsibility for "the navigation of the vessel, insurance, crew and all other matters, same as when trading for their own account." Clause 8 of the charter party places the Captain un-

der the orders and directions of the charterer "as regards employment and agency," but states that the charterer was to "load, stow, and trim the cargo at their expense, under the supervision of the Captain." We conclude that final decisions as to stowage were made subject to the discretion of the Captain, and were his responsibility.

The Captain occupies a dual role with regard to such decisions. He acts for the shipowner where his stowage decisions are made with regard to the seaworthiness and safety of the vessel; he acts for the cargo owner where his decisions do not affect the seaworthiness or safety of the vessel, but affect the safety of the cargo only. Oxford Paper Co. v. The Nidarholm, 1931, 282 U.S. 681, 51 S.Ct. 266, 75 L. Ed. 614; Mobile, Miami & Gulf S.S. Co. v. Lake Giltedge S.S. Co., 5th Cir. 1934, 68 F.2d 370; The Thomas P. Beale, 3rd Cir. 1926, 11 F.2d 49, 53; The Santona, S.D.N.Y.1907, 152 F. 516, 518.[14]

While the arrangement of the banana cartons affected the safety of their contents, it more pertinently affected the capacity of the ship to transport the delicate cargo in the manner specified by the charter party.[15] The

carrier and without the fault or neglect of the agents or servants of the carrier, but the burden of proof shall be on the person claiming the benefit of this exception to show that neither the actual fault or privity of the carrier nor the fault or neglect of the agents or servants of the carrier contributed to the loss or damage."

14. *The Nidarholm*, the Supreme Court declined to adopt or reject an asserted distinction which would bar the shipowner's liability where cargo alone was imperiled. 282 U.S. at 684–685, 51 S.Ct. 266. See n. 16, infra, In Canadian Transport Co., Ltd., v. Count Line, Ltd., House of Lords 1940, A.C. 934 at 944, Lord Wright regarded the phrase "under the supervision of the Master" as an unnecessary expression of the pre-existing right of a vessel's master to limit the charterer's control of the storage. "The

master is responsible for the seaworthiness of the ship and also for insuring that the cargo will not be so loaded as to be subject to damage, by absence of dunnage and separation, by being placed near to other goods or to parts of the ship which are liable to cause damage, or in other ways * * *. [To] the extent that the master exercises supervision and limits the charterer's control of the stowage, the charterer's liability will be limited in a corresponding degree." We interpret that latter expression of the limitation on the liability of the charterer and the consequent imposition of liability on the vessel or its owner to be a process effected where there has been a difference of view between the master and the charterer. That situation was not present in the instant case.

15. The Regulus, S.D.N.Y.1883, 18 Fed. 380. Although the district court herein did not rule explicitly that the faulty stowage

capacity of the ship to perform the role assigned by the charter party is an aspect of the seaworthiness of the vessel. See The Nidarholm, supra, 282 U.S. at 685, 51 S.Ct. 266; The Southwark supra, 191 U.S. at 8–12, 24 S.Ct. 1, 48 L.Ed. 65. Since the arrangement of the cartons in the hold critically affected the ship's carriage of the cargo in the specified and proper manner, decisions by and for the master with regard to the stowage of these cartons must be said to have been made on behalf of the ship's owner.[16]

We conclude that the Captain and his mate, in stowing these bananas too closely together, were acting for and in behalf of the ship's owner, although not to his best interest.

As a result of responsibility for the causes contributing to the loss of bananas on voyage no. 1, Horn is liable for all of the cargo damage arising from that voyage.

*Damages.*

The district court awarded damages to Atkins in the amount of $31,261.64 as a result of voyage no. 1. It considered conflicting testimony as to the actual quantities of ripened bananas, the extent of ripeness, and the market value of the various categories. We affirm the determination of the amount owed Atkins as a result of voyage no. 1.

## III.

## VOYAGE NO. 4

On the fourth voyage under the HEINZ HORN'S charter, the bananas were loaded by the stem. The master for that voyage, Captain Heinz Freytag, stated on deposition that vertically-placed bin boards were used to separate the cargo to prevent it from shifting during the voyage. The district court concluded with respect to both of the voyages under consideration that "the officers failed to cause the bananas to be stowed properly." 233 F.Supp. at 642. While such apparently was the case on the first voyage, we find only slight evidence in the record to indicate that the manner of stowage employed on voyage no. 4 contributed to the ripening of that cargo of bananas. Most of the testimony adverse to the stowage technique employed referred to voyage no. 1.

Captain Freytag remarked in his deposition that the cargo on voyage no. 4 did not fill the holds. He stated that the resultant empty hold areas caused turbulence in the air circulation, making difficult the exhaust of foul air and gasses. We pass any question of responsibility for the implied shortage of cargo and for the placement of the stems, for there is no testimony or evidence relating the "turbulence" to the damaged cargo.

resulted in improper ventilation, and thus the capacity of the ship to cool the bananas, we have no doubt that such determination is implicit in, and, indeed necessary to its findings.

16. Compare Bull v. New York & Porto Rico S.S. Co., 2nd Cir. 1909, 167 F. 792; Isbrandtsen Co. v. The George S. Boutwell, S.D.N.Y.1957, 1958 A.M.C. 351; Canadian Transport Co., Ltd. v. Count Line, Ltd., House of Lords, 1940, A.C. 934; where the master of the vessel was found to have acted solely in behalf of the charterer in stowing the cargo. In those cases the method of stowage had no effect on the ability of the vessel to provide the required mode of transporta-

tion; nothing was required but stowage space itself. In American Tobacco Co. v. The Katingo Hadjipatera, S.D.N.Y. 1948, 81 F.Supp. 438, modified, 2nd Cir. 1951, 194 F.2d 449, where faulty stowage was found to have hindered ventilation of the cargo, the court held the charterer liable; the master, however, had no supervisory duties as to stowage, and, in any event, had protested, for the ship, to the stowage method used.

In this regard, we believe Bergan v. International Freighting Corp., 2nd Cir. 1958, 254 F.2d 231, relied on by the district court, to be inapposite. That case considered questions of the employee-employer relationship for Jones Act purposes.

The district court erred in finding an absence of due diligence in the stowage of the bananas on voyage no. 4.

Without that factor at issue, the dispute is as to whether the ripening of the cargo resulted from the operation of the cooling system or from the alleged ripened state of some of the cargo when it was loaded. Without evidence to indicate any decline in the condition of the refrigeration mechanism in the period between voyages no. 1 and no. 4, we again approve the district court's determination that the HEINZ HORN was mechanically seaworthy for the purpose of transporting bananas. No question of the adequacy of ship's personnel arises from this voyage.

 Once it has been established that the bananas were loaded in good condition and unloaded in damaged condition, the carrier can avoid liability only by proving that the damage resulted from a cause for which it is statutorily not responsible, or that it exercised due diligence to prevent the harm. Schnell v. The Vallescura, 1934, 293 U.S. 296, 303, 55 S.Ct. 194, 79 L.Ed. 373; Compagnie De Navigation, etc. v. Mondial United Corp., 5th Cir. 1963, 316 F.2d 163, 169; Schroeder Bros., Inc. v. The Saturnia, 2nd Cir. 1955, 226 F.2d 147, 149. The cargo was delivered to Mobile in part at least in an excessively ripened condition. Captain Freytag signed the bill of lading for this particular cargo, dated September 2, 1962. No exceptions were noted on the bill of lading. Thus is raised the rebuttable presumption that the fruit was delivered on board ship in good condition. Fidelis Fisheries, Ltd. v. Thorden, S.D.N.Y. 1956, 142 F.Supp. 798.

COGSA, at 46 U.S.C. § 1304(2) (m), states:

"Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from— * * wastage in bulk or weight or any other loss or damage arising from in-herent defect, quality, or vice of the goods * * *."

The fact that bananas require special care during shipment, due to such characteristics of that cargo as encourage ripening, Lucayan Transports v. McCormick Shipping Corp., supra, is not the circumstance envisioned by that exculpatory clause. Certainly all parties to the charter party understood the nature of such cargo in general and the special ship characteristics necessary for its transport. Rather, to gain assistance from that statutory exculpation, the carrier must have shown some defect, quality or vice adhering to the particular bananas brought aboard. See Compagnie De Navigation, etc. v. Mondial United Corp., supra, 316 F.2d at 168–169.

The district court stated that "there was no proof of inherent defect, quality or vice of the bananas." 233 F.Supp. at 642. Captain Freytag and First Mate Schultz, in depositions, testified that they rejected as too ripe for shipment large quantities of the bananas brought to be loaded. Schultz stated further that Mr. Juan Rios was present as Atkins' representative at loading time and that Rios rejected many stems. Captain Freytag indicated that much of the rejection was based on color, and that the light available during night loading was not sufficient for the color test. Schultz indicated that the banana experts working on the loading operation, presumably including Rios, also had been cutting open selected bananas to examine for ripeness.

Captain Freytag took three stems of the rejected bananas and hung them on the deck during the voyage. He stated that a day out of port these stems were "ripe." He and Schultz inspected the holds and jettisoned bananas that were ripening too fast, 335 stems over a two-day period. Captain Freytag felt that these jettisoned bananas had been brought aboard at night, when they could not be inspected closely, and hastened

the ripening process of the other bananas.[17]

With such testimony the only evidence available to prove the existence of an exculpatory condition of the cargo, we conclude that the district court was not clearly erroneous in finding no proof of inherent defect, quality, or vice in the bananas. The inferential and credibility determinations necessarily made by the district court will not be disturbed.

Since we disagree with the finding that stowage contributed to the cargo damage, and uphold the finding that the bananas themselves possessed no inherent conditions affecting their transport, our affirmance of the district court's determination that the vessel was seaworthy leads us to conclude that the manner of operation of the refrigeration system was the cause of the ripening of the cargo. This conclusion is not made merely for want of a better cause, for there is evidence in the record to support the district court's determination that the crew failed to use due diligence with regard to the pull-down time as well as with regard to the maintenance of proper temperatures.

Whereas eight hours was stated to be the allowable time within which the hold temperatures should reach the proper level once the hatches were closed, the evidence shows that the return air in hold no. 1 settled to the 55-degree level after forty hours [18] and that that in hold no. 2 reached the 55-degree level after forty-eight hours. The air being delivered into both holds generally steadied at an appropriate 52 degrees within the 8-hour period.

Clause 34 of the charter party required that a Refrigeration Clause be included in all bills of lading issued during the period of the charter. The Refrigeration Clause was also incorporated into the charter party itself.[19] That clause purports to bar liability of the shipowner or his ship for the negligent operation of the refrigeration equipment. If the clause is given effect, Horn and his ship cannot be held liable for damages resulting from the operation of the cooling system.[20]

17. The bill of lading was dated September 2. Both Captain Freytag and Schultz testified that some loading was done in the pre-dawn hours of September 3.

18. This exceeds by four hours the trial court's finding. 233 F.Supp. at 641.

19. "34. Owners' usual refrigeration clause is incorporated in this Charter Party and is to be incorporated in all Bills of Lading and Mate's Receipts covering refrigerated cargo shipped by this vessel during the period covered by this Charter Party.

 * * * * *

"Refrigeration Clause

"It is also agreed that if the Shipowners shall have exercised due diligence to make the vessel in all respects seaworthy and properly manned, equipped and supplied, said vessel, her Owners, Agents, or Officers shall in no case be responsible for any loss or damage to any cargo shipped in refrigerated chambers, whether such loss or damage arise from defect or insufficiency either before or after the shipment, in the Hull of the said vessel, or her Refrigeration Machinery, chambers space or apparatus, or any part thereof, or in any material used in the process of refrigeration, and whether such loss or damage, however, arising be caused by the negligence, fault, error in judgment of the Pilot, Master, Officers, Engineers, Mariners, Refrigeration Engineers of [sic] any other servants of the shipowners or persons for whom they are responsible or by unseaworthiness. It is expressly agreed that any negligence, fault, or error in the operation of the said Refrigeration apparatus shall be deemed to be and is hereby expressly agreed to be a fault of error in the management of the vessel within the meaning of this Bill of Lading, and shall not be considered or held to be a fault of failure in the custody, care or stowage of merchandise shipped in Refrigeration space."

20. However, Clause 12 stated:

"That the Captain shall use diligence in caring for the proper ventilation and refrigeration of the cargo, also run temperature in accordance with Charterers' written instructions."

Nevertheless, the Refrigeration Clause was added specifically to the standard charter party form of which Clause 12 was a part. If there is a conflict between these portions, the Refrigeration Clause must here govern. Cf. Cooper v. Pinedo, supra, 212 F.2d at 141–142.

We have observed, supra, that Fruco, the charterer, and one of the parties libellant here "should be allowed no recovery for loss it has not suffered, and its own potential loss is measured by that recovery which it may owe Atkins," the consignee of the cargo. (See text at n. 7, supra.) We also noted supra, text at n. 10, that "we are actually concerned with Atkins' [the consignee's] recovery through Fruco [the charterer] but ultimately against Horn [the owner]." Thus, for there to be any recovery against Horn or his ship as a result of voyage no. 4, the effect of the Refrigeration Clause on the charter party relationship, as well as the effect on the bill of lading obligations, must be assessed.

Considering first that clause and its potential interaction with the COGSA-governed bill of lading relationship, we turn to section 1304, which states that neither the carrier nor the ship is responsible for loss arising from neglect in the navigation or management of the ship.[21] The Refrigeration Clause expressly defined any fault in the operation of the refrigeration apparatus as a fault in the management of the ship.

Section 1303(2), it should be recalled, specifies that "the carrier shall properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried."

"The cases which have defined the scope of the exemption from liability for negligence in the navigation and management of the ship have mostly been concerned with deciding whether a given fault is to be classified as of this sort or is to be regarded as one having to do with the custody, care, etc., of the cargo, for which the carrier is liable."

Gilmore & Black, at p. 134.

"The distinction between a loss due to improper stowage or unseaworthiness on the one hand and a loss resulting from faults or errors in the navigation or the management of the vessel on the other hand requires in many instances a close and discriminating attention to the specific facts of the case."

1 Benedict, Admiralty, § 95, at pp. 288–89.

The same line is drawn both in the Harter Act and in COGSA, so that "the Harter Act cases are important * * * for the direct help they give in pinning down the distinction, in COGSA, between a Section 3(2) [§ 1303(2)] liability and a Section 4(2) (a) [§ 1304(2) (a)] immunity." Gilmore & Black at p. 134. The problem at this point is whether this court can accept the advance determination of the parties, via a clause necessarily a part of the bill of lading, that a particular act be placed on the immunity or the liability side of the statutory line.

In the general context of contractual definition of terms, this court once said:

"It is often almost, if not quite, true that in contracts words mean what their users choose them to mean, neither more nor less, for it is true of most words that their shades of

21. § 1304: "(1) Neither the carrier nor the ship shall be liable for loss or damage arising or resulting from unseaworthiness unless caused by want of due diligence on the part of the carrier to make the ship seaworthy, and to secure that the ship is properly manned, equipped, and supplied, and to make the holds, refrigerating and cool chambers, and all other parts of the ship in which goods are carried fit and safe for their reception, carriage, and preservation in accordance with the provisions of paragraph (1) of section 1303 of this title. Whenever loss or damage has resulted from unseaworthiness, the burden of proving the exercise of due diligence shall be on the carrier or other persons claiming exemption under this section.

"(2) Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from—

"(a) Act, neglect, or default of the master, mariner, pilot, or the servants of the carrier in the navigation or in the management of the ship * * *."
See § 1303(2).

As observed supra, incorporation of COGSA into the charter party serves to limit liabilities under the charter to COGSA dimensions.

meaning are many, and that they take their color and content from the context and subject matter in connection with which they are used." Cocke v. Vacuum Oil Co., 5th Cir. 1933, 63 F.2d 406, 407. Such a reflection is not particularly helpful here, where the matter actually is not one of definition, but of categorization.

■ COGSA prohibits contractual limitation of the carrier's liability for negligence or liability imposed by the Act. 46 U.S.C.A. § 1303(8). See 4 Williston, Contracts, § 1134B at p. 3237 (Williston & Thompson ed.). It follows that, if the manner in which the refrigeration equipment was operated on voyage no. 4 constituted acts and resulted in damages for which the carrier is statutorily liable to the cargo owner, the Refrigeration Clause cannot bar that liability.

■ Messrs. Gilmore and Black have set forth numerous cases demonstrating various performances falling on the liability or on the immunity side of the line. See Gilmore & Black, at p. 137 n. 54. Of the cases cited therein, those which have considered acts dealing with either ventilation or refrigeration of cargo have found such acts to be related to the duty of care owed the cargo, with liability for negligence related thereto imposed on the carrier. See, e. g., Barr v. International Mercantile Marine Co., 2nd Cir. 1928, 29 F.2d 26 (use of improper refrigerant); The Rita Sister, E.D.Pa.1946, 69 F.Supp. 480 (improper ventilation of hold); The Samland, S.D. N.Y.1925, 7 F.2d 155 (failure to observe condition of thermometers in refrigerating compartments). See also General Foods Corp. v. United States, S.D.N.Y.1952, 104 F.Supp. 629 (failure to ventilate vessel). Justice Holmes stated the following test: " * * * the question which section is to govern must be determined by the primary nature and object of the acts which cause the loss." The Germanic, 1905, 196 U.S. 589, 598, 25 S.Ct. 317, 49 L.Ed. 610.

See also Leon Bernstein Co. v. Wilhelmsen, 5th Cir. 1956, 232 F.2d 771, 772. Since the operation of the refrigeration system herein so directly affected the condition of the cargo, we conclude that the damages related thereto fall within the liability created by § 1303(2). The Refrigeration Clause therefore cannot be allowed to bar liability for cargo damage so far as the bill of lading relationship between the cargo owner and the charterer is concerned. We do not hold, however that such a Refrigeration Clause can never have sway in the presence of COGSA, for there may be circumstances where the operation of a refrigeration system has more to do with the management or navigation of a vessel than with the care of the cargo.

■ The charter party incorporated COGSA. The parties must be presumed to have intended to incorporate all the effects of that statute. We therefore apply the reasoning set forth above and hold that the refrigeration clause does not bar the owner's liability under the charter party to "use due diligence in caring for the proper ventilation and refrigeration of the cargo" (charter party clause number 12), nor the liability assumed by the incorporation of COGSA.

We therefore affirm the judgment of the district court insofar as it awarded damages to Atkins as a result of loss of cargo on voyage no. 4.

IV.

CHARTER HIRE FOR PERIOD BETWEEN VOYAGES NO. 1 AND NO. 2

*In Mobile.*

Fruco declined to pay $5,594.39 potentially due Horn for charter hire. Of that amount, $4,327.73 represented the approximately seven-day period in Mobile, after unloading from the first voyage, when the ship lay without orders. Approximately one day of that period admittedly was at Horn's expense, for dry-dock inspection, to the amount of $676.44. There is no doubt that the

charter party provided that the ship sail on orders of the charterer.

The district court found that "the assertions of Atkins that he rescinded the charter party at the end of Voyage No 1 are unsupported by the evidence." 233 F.Supp. 642.

Atkins testified that after he saw the cargo discharged on arrival from the first voyage, he spoke "a number of times" with Mr. Ulrich Mahn, a representative of the chartering agent. He stated that he told Mahn on June 22, the day of unloading, that the vessel was not suitable and was not properly crewed, and that it was his intention to place the HEINZ HORN off-hire. At another point in his testimony, Atkins stated that he told Mahn that the vessel would remain off-hire until it sailed, and that Mahn agreed. Mahn apparently reassured Atkins with promise of improved services. Atkins said that he agreed to "a trial basis, on a trip-by-trip basis." A letter from Atkins to Captain Freytag on June 25 referred to the second voyage to Puerto Bolivar as a "trial to see if the vessel can carry fruit satisfactorily." Copies of that letter went to Mahn and Mr. Jan Grisbolt, the chartering broker's representative. In response by letter of June 27, Captain Freytag stated that he was unable to agree with Atkins' letter of the 25th and that he, Freytag, had no authority or intent to change any term of the charter party. Mahn testified that he made no agreement with Atkins to the effect that the HEINZ HORN would operate on a trip-by-trip basis, rather than in accord with the charter.

Atkins has further argued that the charter parties were rescinded as a result of frustration of purpose. While the outturn of ripened bananas on subsequent voyages (see n. 11, supra) apparently was higher than normal, such had not occurred at the point at which Atkins says the charter party was frustrated.

The record supports the conclusion that the charter party was not rescinded at the conclusion of voyage no. 1. Cf. Aaby v. States Marine Corp., 2nd Cir. 1950, 181 F.2d 383.

Clause 15 [22] provides that the charterer is not liable for payment of hire for time lost from "deficiency of men." We have seen already that the owner failed to exercise due diligence with respect to personnel aboard for the first voyage. The testimony shows that the time lost in Mobile, excepting the period of dry dock, resulted from the delay in disposing of the damaged bananas. The bananas were damaged, in part at least, as a result of inadequacy of personnel. The time lost in Mobile resulted from "deficiency of men."

*In Puerto Bolivar.*

Fruco and Atkins have explained that the HEINZ HORN was expected to turn around and return to Puerto Bolivar for the second voyage immediately after discharging its cargo in Mobile on June 22. The charterer then claims that the condition of the cargo, and its disposition, resulted in the delay in sailing until the 29th, and thus its failure to pick up the cargo scheduled for the second voyage. When the vessel did arrive in Puerto Bolivar, it had to wait two days before a substitute cargo was collected. The charterer withheld $1,266.66 in charter hire for those two days.

Since the time lost here again resulted from the time lost in disposing of bananas damaged on the first voyage, we conclude that the time lost was a result of the "deficiency of men," which resulted in the damage to the cargo.

We conclude that the district court was erroneous in awarding the sum of $4,917.95 in charter hire for these two periods.

22. "15. That in the event of the loss of time from deficiency of men or stores

* * *, the payment of hire shall cease for the time thereby lost * * *."

## V.

### REDELIVERY OF THE VESSELS TO THE OWNER

*HEINZ HORN.*

■■■ Fruco redelivered the HEINZ HORN to her owner October 3, 1962, a month past the minimum three-month period. She went on hire to another charterer on October 4.

Fruco claimed that it gave notice of delivery by letter of September 21, confirmed by telegram of September 27. Horn argues that whichever date was the effective date of notice, it was entitled to charter hire for thirty days from that date, as a result of a thirty-day notice requirement in the charter. The district court felt it unnecessary to pinpoint the date of notice, finding that Horn had been able to mitigate any potential damages for lack of use for the vessel by the immediate recharter.

The only testimony regarding the asserted mitigation of damages was from Mahn, the charter broker. His statements, self-serving though they may be, are not controverted by any evidence from Fruco. We might conclude from his testimony that under the subsequent charter the HEINZ HORN operated at an expense differential of $210.96 per day. Adding Horn's daily profit of $6.92, we could find that Horn is entitled to $217.88 per day for each day of the thirty-day period not allowed. Considering the testimony from another angle, we note that the total hire earned on the subsequent charter was at a higher total rate than the monthly $19,000.00 paid by Fruco. The district court had opportunity to study the testimony in light of the witnesses' demeanor. With this in mind, we are unable to hold erroneous the finding of the court that the owner mitigated any alleged damages. Thus we do not consider the question of whether Horn actually was entitled to its thirty-day notice, or the question of the actual date on which notice of redelivery was made.

*MARIE HORN.*

The same letter and telegram applied to the MARIE HORN, which was chartered for a four-month minimum period, expiring November 12, 1962. Again, the only testimony as to damages here is from Horn's witness Mahn. The same sort of analysis was made for both vessels and we conclude, as with the HEINZ HORN, that the MARIE HORN mitigated any damages it otherwise might have suffered.

## VI.

### INTEREST ON THE JUDGMENTS

■■■ The district court computed interest as follows:

"Atkins is further entitled to interest at the rate of 6% per annum from June 22, 1962, on the cargo damage on Voyage No. 1, and from September 12, 1962, on the cargo damage on Voyage No. 4.

"Horn is entitled to interest at the rate of 6% per annum from June 22, 1962, on the charter hire withheld as security for cargo damage on Voyage No. 1; from June 29, 1962, for the charter hire withheld for the time the HEINZ HORN was tied up in Mobile; and from July 8, 1962, for the charter hire withheld for stand-by time in Bolivar." 233 F.Supp. at 643.

Horn argues on appeal that this method of computation, in effect, allows Atkins the benefit of the interest on the sum withheld as security as well as on the sum awarded. This plainly is not correct. We find no error in the assessment of interest.

## VII.

The judgment is reversed as to the charter hire awarded Horn for the two periods of inactivity prior to voyage no. 2. The judgment is affirmed in all other respects. Costs of appeal are taxed against Horn.