**WATERMAN STEAMSHIP CORPORATION,**
**Plaintiff-Appellant,**

v.

**UNITED STATES of America,**
**Defendant-Appellee.**

**No. 764, Docket 77–6194.**

United States Court of Appeals,
Second Circuit.

Argued March 9, 1978.
Decided March 2, 1979.

Michael Marks Cohen, New York City (Burlingham, Underwood & Lord, New York City, on brief), for plaintiff-appellant.

Michael Kimmel, Atty., Civ. Div., App. Sec., Dept. of Justice, Washington, D. C. (Barbara Allen Babcock, Asst. Atty. Gen., Washington, D. C., Robert B. Fiske, Jr., U. S. Atty., Morton Hollander, Atty., Civ. Div., App. Sec., Dept. of Justice, Washington, D. C., on brief), for defendant-appellee.

Before WATERMAN and OAKES, Circuit Judges, and WYZANSKI, District Judge.*

WATERMAN, Circuit Judge:

Plaintiff-appellant Waterman Steamship Corporation ("Waterman") brought suit against the United States in the United States District Court for the Southern District of New York, alleging that the federal government, acting through the Military Sealift Command ("MSC"), had breached a written contract of carriage by wrongfully refusing fully to compensate Waterman for the transportation and unloading of United States military equipment on seven voyages. In its answer the United States categorically denied that it owed Waterman any more money than that which it had already paid for the transportation and discharge of the cargo. On cross-motions for summary judgment, the district court, Duffy, J., denied Waterman's motion for summary judgment and granted the United States's motion for summary judgment dismissing the complaint. We approve the grant of the government's motion for summary judgment and affirm the judgment entered below.

The sole question we must resolve on this appeal concerns the construction of the contract between Waterman and the federal government.

In June 1974 Waterman and the government entered into an ocean carriage contract which incorporated by reference the provisions of MSC's standard Shipping Agreement and Rate Guide ("Agreement"). Pursuant to the terms of the Agreement, Waterman undertook to transport military cargo over specified routes at specified "rates" of reimbursement. The basic "rates" for the *transportation* of goods, set forth in Section II of the Agreement, were stated in terms of dollars per measurement ton ("MT"), an MT consisting of 40 cubic feet. These transportation rates varied, however, according to the nature of the cargo being carried. Thus, separate transportation rates were specified for the carriage of regular cargo, light vehicles, heavy vehicles, hazardous cargo, reefer, and so forth, with regular cargo identified as Cargo NOS ("not otherwise specified"). Transportation *charges* (*i. e.,* "freights") generally would be computed by multiplying the *rate* (which was dependent upon the type of cargo being transported) times the volume (stated in terms of measurement tons of 40 cubic feet each) of the cargo being shipped. It is also important to point out that these rates were "applicable on an FIO [Free In and Out] basis," (Agreement, Section II, ¶ 1A); that is, they were designed to compensate the carrier for transportation services only, and were promulgated on the assumption that the carrier would not be providing any stevedoring services.

---

* Honorable Charles E. Wyzanski, Jr., of the U. S. District Court for the District of Massachusetts, sitting by designation.

The Agreement provided for transportation by bargeships known as LASH (an acronym for "lighter-aboard-ship") vessels. Carriage on LASH barges involved the stowage of break-bulk cargo in specially constructed vessels which in turn are loaded into special oceangoing ships. The barges are capable of independent inland travel and can be loaded and unloaded expeditiously, thereby avoiding long in-port delays. *See Armco Steel Corporation v. Stans*, 431 F.2d 779, 783 (2d Cir. 1970).

Generally, no one shipper utilizes the entire carrying capacity of a barge. Thus, to realize maximum revenues from the transportation of cargo, a barge must ordinarily carry, on any one voyage, cargo received from a number of commercial shippers. Under the terms of its contract with Waterman, however, the government expressly reserved the right to demand exclusive use of certain barges, although the government cargo may not have required the use of the barge's full carrying capacity. The Agreement provides that, in the event the government invokes the exclusive use option, the government is to pay a minimum ocean transportation charge designed to compensate Waterman for the transportation revenues it would presumably have obtained from other commercial shippers. The minimum charge was computed on the assumption that, but for the government's invocation of its right to exclusive use of the barge, the barge would have been loaded to at least 75 percent of its carrying capacity. Thus, at the time of the original agreement between Waterman and the government in 1974, Section II, ¶ 1E of the Agreement provided as follows:

> E. Barge Exclusive Use Payment: Cargo shipped in a barge required for exclusive use by the Contracting Officer for military cargo shall be freighted at the applicable cargo category rate subject to a minimum charge per barge computed by applying the Cargo NOS rate to seventy five percent (75%) of the inside cubic capacity of the barge.

In 1975 the provision was amended to read:

> E. Minimum Per Barge: Vehicles shipped in a barge shall be freighted at the applicable rate subject to a minimum charge

per barge computed by applying the lowest of the three commodity rates NOS, light vehicles, heavy vehicles to 300 MT for LASH barges and 600 MT for SEA-BEE barges. This minimum is applicable only when the barge is loaded exclusively with vehicles booked under the terms of this Agreement.

The parties agree that, inasmuch as 300 MT represents 75 percent of the "inside cubic capacity of the [type of barge]" used to transport the government's cargo, the amendment had no significant effect upon the minimum transportation charges to which Waterman was entitled. Of course, if the government invoked its right to exclusive use and the total tonnage of the cargo transported exceeded 75 percent of the carrying capacity of the barge, the transportation charges would then be calculated by multiplying the applicable transportation rates times the *actual* inside cubic capacity utilized.

Ordinary transportation rates are designed to compensate the carrier for transportation services only and not for stevedoring services. The expectation of the parties to the Agreement was that ordinarily "[t]he Government shall perform or arrange for the loading and discharging of cargo . . . ." Agreement, Part I, 1:5(b). Under the terms of the Agreement, however, the government was granted "the option to require [Waterman] to discharge or load cargo at [a] foreign port." Agreement, Section II, ¶ 12A. In the event that this particular option was exercised, ¶ 12C (of Section II) of the Agreement provided that "[w]hen the Government exercises the option set forth in [¶ 12A], the applicable FIO rates set forth herein shall be increased by the charges set forth in the *Table of Charges for Stevedoring and Terminal Services* ["Table" or "Table of Charges"] to cover cost of discharging or loading between place of rest on the ship and the end of ship's tackle at the overseas port." Agreement, Section II, ¶ 12C. The Table contained "charges" listed in stated dollar rates per MT for the loading and discharging of specified categories of cargo by particular carriers at particular foreign ports, stating that "[t]he following *charge* [in

$/MT$] shall be added to the [basic] *rates set forth in this section . . . when cargo loading or discharging at the overseas port is performed under the option provided in paragraph 12A of this section.*" (emphasis supplied).

The seven voyages for which Waterman claims it was not adequately compensated occurred during the period from October of 1974 through June of 1975; all these voyages were between Gulf coast ports of the United States and ports in the Middle East. For each voyage, the government invoked both its right to exclusive use of the barges *and* its right to have the ocean carrier offload the cargo.

On all seven voyages, Waterman computed the minimum charge for exclusive barge use on the basis of a "composite" rate, a total reached by adding the Cargo NOS [1] rate for ocean carriage plus the offloading charges and the Suez Canal Surcharge.[2]

For the seven voyages in dispute Waterman, pursuant to the government's standard billing instructions, separately invoiced the ocean carriage minimum charge and submitted separate invoices for the offloading services. The government paid the invoices for the ocean carriage in full. The separate invoices for offloading were billed at the minimum tonnage charge per barge (300 MT), but the government refused to pay $113,780.41 of the sums so invoiced for offloading services, paying only for the actual tonnage discharged at the applicable rate for each item.

Turning to the merits, the sole issue before us is whether, under the terms of the Agreement, the parties intended, when the option was exercised for the exclusive use of barges and offloading was requested, that the total freight bill should be computed on the basis of the composite rate Waterman claims applicable. Waterman, as above stated, contends that the parties negotiated the contract so as to include the offloading charges as an integral part of the rate. The government, on the other hand, argues that the Agreement cannot be construed so as to provide for the payment of offloading charges based on 300 MT, for to do so results in payment for cargo which had been neither shipped nor offloaded. Instead, it interprets the Agreement as requiring payment of offloading charges calculated by multiplying the actual tonnage offloaded by the standard offloading rate for the commodity (*e. g.*, Cargo NOS, light vehicle, or heavy vehicle). We agree with the government, for we are constrained to find that Waterman's claim (that the rate used to calculate the minimum charge in exclusive use situations when the offloading option is also exercised may be increased by adding the offloading charges to the ocean carriage exclusive use transportation charges) is supported neither by logic nor by the terms of the Agreement.

Paragraph 1E of the Agreement expressly sets forth a minimum charge for the transportation services to be performed by Waterman. That provision states that in exclusive use situations the ocean carrier's *freight charges* shall be "subject to a minimum charge per barge computed by applying the Cargo NOS rate to seventy-five percent (75%) of the inside cubic capacity of

---

1. As already appears *supra*, the provision setting forth the way the charges for ocean transportation were to be computed is found in ¶ 1E of the contract and in 1974 these were based upon the "Cargo NOS rate." In January 1975, ¶ 1E was amended so that the computation would bear a relationship to the commodities being transported, *i. e.*, whether NOS, light vehicles, or heavy vehicles. Two of the seven voyages occurred before, and five after, the amendment. The government paid the bills submitted to it for all of the ocean transportation and the dispute here arises over additional billings.

Hence, as it is unnecessary to spell out the amendment changes to discuss adequately the issues in the case, we use the term "Cargo NOS

rate" throughout the opinion when reference is had to ocean transportation charges.

2. The voyages were to Middle East ports, and the normal route would have been through the Suez Canal. Realizing that transit through the canal might be blocked, the parties agreed in a special paragraph, ¶ 13 of the Agreement, that if such were the case the parties would negotiate a surcharge in order to cover the additional costs of the required longer voyages via the Cape of Good Hope. The canal was blocked, and, after negotiation, a surcharge rate of 25% was arrived at to be paid on each of the two kinds of costs, the ocean carriage and the offloading.

the barge." The government does not challenge the minimum transportation charge so set forth, but it does dispute Waterman's "composite rate," a rate arrived at in computing the charge to the government by including as rate components the basic FIO rate (Cargo NOS) for ocean carriage, the offloading charges, and the Suez Canal Surcharge.

In support of its "composite rate" calculation Waterman directs our attention to ¶ 12C of the Agreement. On the basis of this provision Waterman argues that, in computing the minimum fee applicable in exclusive use situations when the offloading option is exercised, the parties agreed that the Cargo NOS rate should be increased by the offloading "charges" and the composite rate so calculated should then be multiplied by the minimum tonnage (300 MT). Thus a minimum charge is arrived at which compensates Waterman for *both* transportation *and* offloading services.

There are a number of reasons, other than ¶ 12C's unusual use of the terms "rates" and "charges,"[3] why we cannot subscribe to the theory that the parties could have intended that ¶ 12C would have such a significant impact upon the meaning of "Cargo NOS rate" as that term is used in ¶ 1E. First, ¶ 1E is the provision which establishes a minimum fee per barge, and there the terms "rates" and "charges" are used in their normal respective senses and not interchangeably. There is no mention in that provision of any minimum fee for offloading, and without such mention Waterman's inclusion of offloading charges as an integral component of the total sum to be billed to the government is without contractual support. Second, although we certainly would expect that when exercis-

ing its right to exclusive use of barges the shipper would pay a minimum fee for the *transportation* of cargo, there would appear to be, for reasons explained below, no economic justification for requiring the shipper to pay a similarly calculated fee for the *offloading* of the transported cargo.

Paragraph 1E speaks in terms of freight which Waterman defined in its brief as "the total amount paid for carriage." Brief at p. 10. "Carriage" refers only to the ocean transportation of cargo. As stated above, ¶ 1E does not include offloading charges as part of that minimum charge. It is not at all astonishing that the parties contracted to pay a minimum charge for the *transportation* of cargo, for many ocean transportation costs (e. g., fuel, salary of crew, maintenance expenses, insurance premiums, amortization, etc.) remain fairly constant regardless of the actual tonnage being carried. Thus, it is reasonable to expect that when the government, as a shipper, reserves barges for its exclusive use, yet ships an amount of cargo substantially less than that which the ocean carrier would ordinarily carry in the barges, the government should pay a transportation charge which adequately covers the carrier's actual, and generally irreducible, costs of transporting the cargo. Offloading costs, however, unlike transportation costs, remain reasonably constant irrespective of whether the ship is transporting cargo at peak capacity or at substantially below that level and are directly linked to the actual tonnage being offloaded.

Third, ¶ 12C states that FIO rates are increased to cover the cost of discharging and unloading. Under this provision the charge for the offloading services the carrier performs is designed "*to cover cost of*

---

**3.** It is true, as Waterman urges, that, despite the fact that the word "charges" as used elsewhere in the contract (for example, in ¶ 1E) is not used interchangeably with "rates," when "charges" is used in ¶ 12C it does surprisingly appear to be synonymous with "rates." This is shown by the fact that the Table of Charges itself delineates the so-called offloading "charges" in units of dollars per measurement ton; in other words, as far as ¶ 12C is concerned, the "charges" specified there are really "rates." Yet, this blurring of the well-recog-

nized distinction between "charges" and "rates" in ¶ 12C and the corresponding Table, and ¶ 12C's unusual use of the word "charges," causes us to be reluctant to glean anything more from the provision other than that its obvious general purpose was to insure that whenever the government requires the carrier to perform stevedoring as well as ocean transportation *some* additional compensation (at the rates in $/MT specified in the Table) must be paid by the government beyond that which it would pay for transportation services alone.

*discharging . . . [cargo]* between place of rest on the ship and the end of ship's tackle at the overseas port." (Emphasis supplied.) Inasmuch as the costs of discharging cargo decline in direct proportion to any reduction in the tonnage being handled, it would seem that the parties could not have intended that there be any minimum charge for the offloading of cargo. The specific language of ¶ 12C demonstrates that the parties actually intended that the government should pay offloading charges based upon the actual tonnage offloaded, a method of calculation more suitably designed to insure that the offloading charges "cover the cost of discharging . . . [the cargo]."

In support of its use of the composite rate Waterman also places substantial reliance on ¶ 13 of the Agreement, the Suez Canal Surcharge provision. Paragraph 13 provides:

> The rates for routes which would normally involve transit of the Suez Canal do not contain a contingency for Suez Canal blockage. Accordingly, the Carrier shall be reimbursed *a surcharge covering additional costs resulting from such blockage.* The appropriate surcharge shall be subject to separate negotiations between the Carrier and the Contracting Officer when cargo is offered for shipment in accordance with the ARTICLE entitled "CANAL BLOCKAGE" in this Agreement. In accordance with commercial practice, such surcharge shall be applied on the basic rate *and* to the charges for stevedoring and terminal services as set forth in the STATEMENT OF RATES when stevedoring is performed by or for the account of the Carrier. (Emphasis supplied.)

Waterman argues that this provision, which clearly imposes a surcharge on *both* the transportation charges *and* the offloading charges in the event that the Suez Canal is blocked, demonstrates that the parties did not intend that offloading charges *need always* be based on actual offloading costs.

Paragraph 13, however, does not set forth that the surcharge is to be applied against one composite rate but, rather, that it is to be applied on the "basic rate" *and* to "the charges for stevedoring and terminal services." Thus, in ¶ 13 the contract shows a clear intent to keep separate these two items of cost.

What is of real significance is that the contracting parties in the special circumstance of providing for a carrier windfall in the event the Suez Canal was blocked did so explicitly and emphatically and in a special paragraph devoted to that purpose. There is nothing in that paragraph to indicate that the windfall should be spread over the content of the other paragraphs, and there is nothing in the other paragraphs to indicate that the special provision relative to the possible Suez Canal blockage has any bearing whatsoever on the content of those other paragraphs.

While it is true, as Waterman urges, that when there are ambiguous provisions of a contract those provisions should, in general, be construed against the drafter, we agree with the district court's finding that here the language of the contract is unambiguous, and so we conclude that it is unnecessary to resort to the principles of construction applicable to ambiguous contracts.

The judgment of the district court is affirmed.