**SOUTHERN BLOCK AND PIPE COR-PORATION, Plaintiff,**

v.

**M/V ADONIS, her engines, boilers, etc., et al., Defendants,**

v.

**ALCOA STEAMSHIP COMPANY, Inc., Third-Party Defendant.**

**Civ. A. No. 586–69–N.**

United States District Court,
E. D. Virginia,
Norfolk Division.

Nov. 16, 1970.

Guilford D. Ware, Norfolk, Va., for plaintiff.

Braden Vandeventer, Norfolk, Va., for M/V Adonis, etc., and Adonis Compania Naviera, S. A., defendants.

Carter B. S. Furr, Norfolk, Va., for Teseo Steamship Corporation, defendant.

John W. Winston, Norfolk, Va., for Sparti Shipping Company and Matrad Corporation, defendants.

## MEMORANDUM OPINION

MacKENZIE, District Judge.

In consequence of certain contracts, M/V ADONIS, owned by Adonis Compania Naviera, S.A., delivered crushed pumice to Southern Block and Pipe Corporation, at Norfolk, Virginia.

As the unloading process was being concluded, it was found that a fractured fuel oil tank sounding tube in the No. 5 hold had leaked and a considerable part of the cargo had been damaged and was unusable. This damaged pumice was off-loaded into trucks and disposed of. Three days later it was discovered that other adulterated pumice had been unloaded onto the reserve stockpile, spreading the contamination there. Additionally, it was found that many blocks had been inadvertently manufactured from the contaminated pumice and could not be sold on the regular market.

Southern Block sues to recover for the damaged pumice, for the cost of special handling and disposal, for the production and disposition of the spoiled blocks and for the costs of segregating the contaminated material.

The M/V ADONIS' owner, Adonia Compania Naviera, S.A., seeks refuge in two claims. First, it says that Southern Block failed to mitigate its damages and cites the manner in which it unloaded the damaged cargo. Secondly, it would lay the liability on Teseo Steamship Corporation, time charterer of the vessel at the time the errant sounding tube was damaged during unloading of a cargo of bauxite at Port Comfort, Texas, several months earlier.

Teseo Steamship denies negligence or any warranty due Southern Block. It seeks complete indemnity from Adonis for any liability, if any, found against Teseo, on grounds that Adonis owed it the duty, under express warranty, to furnish a staunch, tight, seaworthy vessel, and this the M/V ADONIS was not. Further, it claims that the alleged injury to the sounding tube at Port Comfort was unknown to Teseo, and that repairs satisfactory to the M/V ADONIS were accomplished and accepted by the M/V ADONIS. As an alternative, Teseo also claims reimbursement for any damages decreed against it from the third-party defendant, Alcoa Steamship Company, Inc., the owner and unloader of the bauxite at Port Comfort, Texas.

Alcoa Steamship Company, Inc., which had voyage chartered the M/V ADONIS for the carriage of the bauxite from Jamaica to Port Comfort, where it was discharged August 10, 1969, contends that its duty, if any, sounds in contract with Teseo, and that it owes no other duty to any of these parties; that whatever minor damage which may have occurred to the fuel oil sounding tube was reported to it by the Adonis, was repaired and these repairs were accepted by the M/V ADONIS.

The source of the obligation sought to be charged by the plaintiff against Matrad Corporation, doubling as agent for the shipper and Sparti Shipping Company, is not clear. Suffice it to say that it was an agent only, and no liability attaches. The off-loading was not a responsibility of Matrad Corporation.

Sparti Shipping Company, the voyage charter for this specific carriage of goods, is apparently included in the complaint for damages on a theory of lack of due diligence, but no evidence of such negligence was produced. Sparti, in turn, would protect itself by turning for indemnification from Teseo on the basis of the voyage charter from Teseo and its warranty to provide a seaworthy vessel.

\*　　\*　　\*　　\*　　\*　　\*

## FINDINGS OF FACT

(1) Plaintiff, Southern Block and Pipe Corporation, a Virginia corporation, headquartered at Norfolk, Virginia, is engaged in the manufacture of building block using crushed pumice as a basic raw material. It purchases such pumice from Lava, Ltd. through Lava's agent, Matrad Corporation, and accepted an assignment of the original Bill of Lading issued to Matrad Corporation by the vessel, M/V ADONIS. This Bill of Lading is governed and expanded by the Carriage of Goods by Sea Act, 46 U.S.C. § 1300 et seq.

(2) M/V ADONIS is a bulk carrier owned by the Adonis Compania Naviera, S.A., and time chartered during the period in suit to Teseo Steamship Corporation. Such time charter with Teseo originated September 16, 1968.

Operating under this time charter, the M/V ADONIS had made seven other voyage charters contracted for by Teseo.

(3) On this particular voyage with the cargo of pumice from Yali Island, Greece, to Norfolk, Virginia, the M/V ADONIS had been voyage chartered by Teseo to Sparti Shipping Company.

Upon arrival of the vessel at the dock of the plaintiff, at Norfolk, it became the responsibility of Southern Block to unload the vessel. In this unloading process, all of the personnel and equipment used was supplied by Southern Block.

(4) 24,579 cubic yards of crushed pumice (18,350 Tons) was received aboard the M/V ADONIS in good order. A proper Bill of Lading was issued by the master of the vessel to Matrad Corporation and by it assigned to Southern Block.

(5) On November 6, 1969, the vessel docked at plaintiff's pier at Norfolk for discharge, which discharge continued during the period November 6th through November 10th. Off-loading, almost completely mechanized, was accomplished with plaintiff's crane and clam bucket which would retrieve pumice from the vessel's holds and dump it into a dockside hopper. From the hopper the pumice was moved by conveyor belt along the pier and up to a distribution conveyor above a stockpile area, where it was discharged.

The only employees of Southern Block charged to observe the discharge of the pumice in this largely mechanical process, were (a) Robert Hughes and Charles Rhodes, who supervised and were always [one or the other of them] located on deck at the hatch of the hold being worked, (b) the crane operator, situated some 60 feet above the vessel in the cab of the crane, and (c) a bulldozer operator ashore to constantly trim the main stockpile. Occasionally, a small bulldozer would be lowered into the vessel's holds to knock down pumice around the side of the hold and push it into the center where it could be reached by the crane.

(6) On Sunday, November 10, 1969, about 5:00 P.M., Supervisor Hughes of Southern Block reported to the Chief Mate of the M/V ADONIS that some evidence of contamination had been viewed in the No. 5 hold. They both went to the edge of the hatch on the main deck level and observed the unloading with flashlights. Some stained material could be seen at the bottom of the hole scooped out by the bucket, but much good material remained up against the sides of the hold. Neither man could get down into the hold itself, but as a precaution, work in the No. 5 hold was stopped. The night supervisor, Rhodes, was directed not to resume unloading the No. 5 hold unless the material up around the sides was knocked down into the bottom of the hold to provide undamaged cargo.

Hughes then examined the shoreside stockpile and the conveyor belts and found no other contamination. He left at 6:00 P.M. and gave instructions to be called at home if any foreign substance was seen. Rhodes called him at night relaying a request from the vessel to go back to the No. 5 hold and unload further in order to trim the draft of the vessel at the pier. Only a small volume of material was then discharged, all of which was observed by Rhodes and no contamination was indicated. Again, about 2:30 A.M., Sunday morning, the bucket

of the crane was used to knock down the material build-up around the sides of the No. 5 hold and two or three loads removed as showing no evidence of damage. Some other material, apparently good, was scraped up by the bulldozer and, after examination, was removed.

The trimmer on the stockpile during the night only saw one incident of seemingly damaged cargo and segregated this with the bulldozer.

When Supervisor Hughes returned on the next morning at 6:00 A.M., part of the remaining cargo in the No. 5 hold appeared undamaged and at the request of the Captain of the M/V ADONIS, this was inspected and removed. When about 150 Tons remained in the hold, it was agreed by all, including a Marine surveyor, summoned by the vessel, that the risk of contaminating the stockpile would be substantial if any other pumice was recovered from the hold. The remainder was condemned and hauled off in trucks.

(7) Although the yard of Southern Block was visited by a competent Marine surveyor representing the vessel on several occasions, Monday, and after, and although he was there about the contaminated pumice, none was observed on the stockpile itself, by him or anyone else, until after a hard rain on Wednesday, November 12th, which apparently washed away a surface dust.

(8) Originally, No. 5 hold held 3,224 Tons of pumice. About 1500 Tons had been discharged when the first indication of fuel oil contamination appeared. However, the storage stockpile ashore, including the 16,000 Tons (estimated) unloaded from this vessel, contained about 40,000 Tons total.

(9) When damaged pumice was observed on the stockpile on Wednesday, November 12th, all parties summoned marine surveyors. A program of continuing manufacture, but seeking out and discarding damaged blocks, and segregating the uncovered oily pumice on the stockpile was continued until the matter cleared up on December 19, 1970.

Altogether, about 7,500 Tons of stockpiled pumice was condemned and hauled away. The spoiled building blocks were sold at public sale.

(10) The source of contamination was a fractured fuel oil tank sounding tube extending down the after bulkhead of the No. 5 hold.

In pre-trial discovery, it has been found that the tube had been dented at Port Comfort, Texas, in early August, 1969. The M/V ADONIS was then operating under the same time charter to Teseo Steamship and had been voyage chartered by Teseo to Alcoa Steamship Company, Incorporated for carriage of bauxite terminating at Port Comfort. In acting as its own stevedore, Alcoa equipment had dented and damaged the fuel oil sounding tube.

In an account between the M/V ADONIS, by its master and Alcoa representatives over this damage, temporary repairs, satisfactory to the ship had been effected at Mobile, Alabama and accepted by the ADONIS. Whether Alcoa may be liable for permanent repairs at such time as is more convenient to the ADONIS is not here an issue. For purposes of this suit, such temporary repairs as were considered by the vessel to be required were undertaken and accepted by the vessel, and served to discharge Alcoa's responsibilities in these circumstances. The later damage resulting from the failure of the temporary repair which was arranged for, supervised and accepted by the vessel, cannot be laid to Alcoa.

(11) A recapitulation on December 19, 1969, indicated that 7475.5 Tons of defective pumice had to be disposed of at a loss of $39,246.38. Southern Block expended $2,442.31 to unload some of the contaminated pumice from the vessel, and for truck hire and disposal of the same; had expended $2,105.21 for labor in separating the damaged cargo. $15,717.-24 was expended in manufacturing block which later was declared to be defective; $1,078.68 had been expended for inspectors on the block assembly line. Approx-

imately $2,000.00 had been accumulated by Southern Block and Pipe in miscellaneous and proper expenses related to the contaminated pumice and the defective block manufactured therefrom. Credited against these expenses were $2,432.85 and $475.58 realized from the sale of the defective block. As a total result, Southern Block and Pipe claims a loss of $59,401.15.

■ The court expressly finds that the actions of employees of Southern Block in the unloading of the vessel were reasonable, free of negligence and that a failure to mitigate damages has not been shown by a preponderance of evidence.

The court expressly finds the amount of $59,401.15 to be the proper damage figure.

*   *   *   *   *   *

## CONCLUSIONS OF LAW

(1) The Carriage of Goods by Sea Act, 46 U.S.C. § 1303, provides that the carrier shall be bound, before and at the beginning of the voyage, to exercise due diligence to—(a) make the ship seaworthy; (b) to properly man, equip, and supply the ship; (c) to make the holds . . . in which goods are carried fit and safe for their reception, carriage and preservation.

■ The "carrier" is defined (46 U.S.C. § 1301) as: "(a) the term 'carrier' includes the owner or the charterer who enters into the contract of carriage with a shipper." In the case at bar, the carrier is the M/V ADONIS. The "charterer," as used in 46 U.S.C. § 1301 (a), would be a bare boat charterer or a charterer upon a complete demise who stood in the place of the owner and not the voyage charterer, Sparti. This is manifestly clear since in 46 U.S.C. § 1303, the carrier who must "(a) make the ship seaworthy . . . " is the same carrier who must, under § 1303(1) (b), properly man the ship. In the charter in the case at bar, the owner of the vessel maintained complete control of its manning, equipping, and supply and is manifestly the "carrier" as envisaged under the Carriage of Goods by Sea Act.

Such was a like holding in Compagnie De Navigation Fraissinet & Cyprien Fabre, S.A. v. Mondial United Corporation et al., 316 F.2d 163 (5th Cir. 1963). In an opinion written by Judge Brown, the court says:

" . . . . Bills of lading were issued for the Master. The goods were loaded aboard the vessel, transported on her and discharged from the ship at the port of destination. In the absence, then, of clear evidence showing a contractual relationship between owner and charter of a kind which would absolve the vessel and her owners from all responsibility for cargo, the vessel (and her owner as Claimant) is a 'carrier' as that term is used in § 1301 of C.O.G.S.A. With that status, the vessel thereby become subject to the liabilities and responsibilities imposed under § 1304." (At page 172.)

This same reasoning applies as well to § 1303 of the Carriage of Goods by Sea Act.

Likewise, in an opinion by Circuit Court Judge Waterman, Second Circuit Court of Appeals, Instituto Cubano De Estabilizacion Del Azucar v. T/V Golden West, 246 F.2d 802 (2nd Cir. 1957)

". . . . It is equally obvious that the master of the T/V Golden West accepted the molasses, issued bills of lading therefor, and carried the cargo, all pursuant to the terms of a charter party between the libelant and Transocean Shipping & Trading Company, to which charter this respondent (the vessel) was not a party; but when the master signed the bills of lading the vessel owner became liable *in personam,* and the vessel liable *in rem,* in the event there should be any failure in the performance of the contract of carriage the bills of lading evidenced." (At page 803.)

■ (2) Having thus determined that the Bill of Lading issued by the M/V ADONIS was subject to the Carriage of Goods by Sea Act as being a contract for the carriage of goods by sea from a

**884**

foreign port to a port in the United States, and having determined that the vessel, M/V ADONIS, was the carrier responsible, in the case at bar, under 46 U.S.C. § 1303 to use due diligence to make the ship seaworthy, it is the opinion of this court that the actions of the vessel as respecting the damaged fuel oil tank sounding tube extending through the No. 5 hold does not meet the statutory test of due diligence and that the ship is liable to the plaintiff.

The captain observed the damage to the fuel oil tank sounding tube in August, 1969 at Port Comfort, Texas. While there is some confusion as to whether an actual fracture was then in evidence, he felt it sufficiently important to log and to make a protest of the damage to the stevedores who had unloaded bauxite at that port. He likewise felt the damage to have been of sufficient importance to make it an incident of official survey at Mobile, Alabama, shortly thereafter. The vessel considered such damage also important enough to have temporary repairs in the use of a sleeve inserted over the point of damage, which was done and accepted by the vessel at Mobile. The captain's reason for effecting a *temporary* repair, as opposed to a permanent repair, was because his schedule was such that he could not stop long enough to gas free the area and tanks for the "hot work" which permanent repair would require. Nor did he wish to bear that expense at this time because he was having a general repair lay-up shortly.

In view of his obvious consideration of matters concerning the damage to the fuel oil sounding tube, he nonetheless failed to perfect permanent repairs for reasons which would suit his company's own economic interests. And all of this in spite of the fact that he knew that his next cargo was destined to be highly absorbent pumice stone which would be particularly susceptible to damage by fuel oil which might escape from the damaged tube.

Even the expert witness testifying on behalf of the M/V ADONIS stated that the collar repair of the dented tube should have been a steel collar and not the soft leather collar that was used.

In view of the failure, therefore, of the M/V ADONIS to exercise due diligence to make the ship seaworthy, the court finds that the vessel, *in rem*, and the owner, *in personam*, are liable to the plaintiff herein for the benefit of whose cargo the Carriage of Goods by Sea Act is designed.

(3) A similar result might well be reached by laying off indemnities from Sparti to Teseo to Adonis by way of express warranties of seaworthiness contained in the language of the voyage charter and time charter, but in view of the court's feeling as expressed in this Memorandum Opinion, quite frankly no effort has been made to explore this in depth.

(4) The claims for indemnity for attorneys' fees are denied.

(5) Attorneys for the plaintiff will prepare a proper judgment order, in accord with this Memorandum Opinion, in the amount of $59,401.15.