NITRAM, INC., Plaintiff,

v.

Motor Vessel CRETAN LIFE, her engines, tackle, apparel, etc., in rem., et al., Defendants.

SKOPI SHIPPING CO., LTD., in personam, Defendant-Third-Party-Plaintiff-Appellee,

v.

ITALMARE SHIPPING COMPANY et al., Third-Party-Defendants-Appellants-Cross-Appellees,

v.

MONTEDISON, S.p.A., Third-Party-Defendant-Appellee-Cross-Appellant,

Eller and Company, Intervenor.

No. 76-3234.

United States Court of Appeals, Fifth Circuit.

Aug. 3, 1979.

Paul D. Hardy, Tampa, Fla., for Italmare Shipping Co.

David G. Hanlon, Tampa, Fla., for Montedison.

Kirkby Ressler, New York City, Nathaniel G. W. Pieper, Tampa, Fla., for Skopi & Cretan Life.

Before RONEY, TJOFLAT, AND HILL, Circuit Judges.

JAMES C. HILL, Circuit Judge:

This case revolves around the damage to, and the short delivery of, a cargo of calcium ammonium nitrate (CAN). The principal actors are the shipowners, the time charterer and the voyage charterer. Although the legal issues involved are too numerous to be susceptible of handy summation, suffice it to say that the ultimate issue before us is who will pay for the damaged cargo and its short delivery. Not surprisingly, each party unselfishly nominates the other for that honor. The resolution of this issue takes us along a tortuous path where we encounter novel questions of statutory construction and contract interpretation. In the end, we finish close to where we started, affirming in all but one aspect the judgment of the district court.

## I. FACTS

Nitram, Inc. of Tampa, Florida, purchased a cargo of 13,503.18 short tons of CAN packaged in 245,000 bags of 50 kilograms each. The transaction was negotiated through a mineral trading firm in New York, which arranged to acquire the CAN from Montedison, S. p. A. (Montedison) of Milan, Italy.

Pursuant to its obligations under the contract, Montedison entered into a voyage charter with Navigation Transoceanique, S.A., (Transoceanique) for a vessel to transport the CAN to Tampa. The vessel supplied by Transoceanique, the *Cretan Life,* had been time chartered from Skopi Shipping Company (Skopi) by Italmare Shipping Company (Italmare), who in ·turn entered into an identical time charter of the vessel to Transoceanique, its wholly-owned subsidiary.

The time charter arrangements between Skopi and Italmare, and, in turn, between Italmare and Transoceanique, were in the form of a standard New York Produce Exchange Charter Party. These instruments contained the standard Clause 8 provision which requires the charterers to load, stow, trim and discharge the cargo at their expense under the supervision of the Captain. The voyage charter entered into by Montedison and Transoceanique was a FIOS (free in and out stowage) charter utilizing the printed GENCON (Geneva Conference) Form, with two additional pages of typed provisions. The typed provisions contained these two important clauses:

18. Vessel must be cargo battens fitted. If cargo battens missing, Owners to supply and laydown dunnage in lieu of cargo battens.

19. Cargo to be loaded and stowed free of risk and expenses to the vessel by Charterers' Stevedores at the aver-

age rate of 1250 metric tons per weather working day of 24 consecutive hours, Sundays and Holidays excluded, unless used. Stevedores and labour to load and stow cargo under Masters control, and direction and to be considered as Owners' servants. Any responsability [sic] whatsoever resulting from negligence, error and judgment and bad stowage to be for Owners' liability.

The vessel arrived at Porto Marghera on January 14, 1974, and docked at Montedison's pier in the morning. Montedison issued a formal acceptance of the vessel's Notice of Readiness. Italmare's [1] agent asked the ship's Master, Captain Zabouinis, to insert in the ship's cargo holds wooden dunnage boards [2] which were available on board, but the Master declined to do so because time did not permit the laying of the boards. Moreover, despite his request, the Master did not receive a copy of the voyage charter party until loading had already commenced.

Loading commenced at 5:30 p. m. on January 14, 1974, in hatches number two and five. Loading was accomplished by the use of a conveyor belt system which moved the bags rapidly into the vessel's holds, allowing them to drop onto the stow from a height of two to three meters with the result that many bags were broken. On January 15, the Master protested the manner of stowage to Italmare's agent.

Due to the rapidity of the mechanical loading process, the district court found that it was not reasonably possible for the ship's personnel to make an accurate tally of the number of bags stowed. The only count made during loading was through the use of a photoelectric counting device supplied by Montedison.[3] In reliance on the count supplied by Montedison, the Master

---

1. Italmare and Transoceanique will hereinafter be referred to simply as Italmare.

2. Dunnage boards are boards placed under cargo in the hold of a ship to keep it dry and prevent movement of the cargo.

3. The evidence introduced by Montedison also indicated that three separate counts of the bags were made prior to their being filled.

signed a clean bill of lading indicating that the vessel had on board 245,000 bags; the bill of lading expressly incorporated all the terms of the voyage charter.

The *Cretan Life* sailed for Tampa on January 22, 1974, and arrived on February 12, 1974, where discharging operations commenced at approximately 10:00 a. m. When the hatches were opened, it was discovered that there was widespread rupturing of bags, causing spillage throughout all six holds of the ship. The expert testimony was to the effect—and the district court so found—that the cause of the damage to the cargo was negligent stowage and the absence of dunnage and cargo battens. The discharging stevedore, Eller and Company counted 240,508 bags at discharge in addition to 267.48 short tons in bulk of CAN removed from the holds of the vessel. The spillage of CAN throughout the ship prolonged the discharging operations and made them more expensive than they would have been had the cargo arrived in good condition. In addition to extraordinary discharging expenses, Nitram was forced to acquire enclosed storage for the entire cargo since much of the cargo was discharged in bulk and in broken bags and could not be exposed to the weather.

The discharged cargo was placed in several warehouses; eventually, most of it was removed from the bags and loaded into railroad cars in bulk. According to Nitram's records, it received only 13,143.39 short tons of CAN, 359.8 short tons less than the 13,503.18 short tons it had purchased. Moreover, because of the delay in discharging caused by the damage to the cargo, discharging operations did not end until 5:45 p. m. on March 1, 1974. The voyage charter specified that the cargo was to be discharged at the rate of 2,000 tons

per day; therefore, Italmare claimed demurrage from 4:30 p. m. on February 21, 1974, through the completion of discharging. Calculated at the rate of $4,000 per day as set forth in the voyage charter, the claim for demurrage totalled $32,083.34.

Nitram filed suit against Skopi in the district court for the Middle District of Florida, seeking damages for short delivery of cargo and extraordinary discharging expenses incurred as a result of the damage to the cargo. Skopi in turn filed a third party complaint against Italmare and Montedison seeking indemnity for any damages awarded against it in favor of Nitram.[4]

Italmare cross-claimed against Montedison for indemnity from any sums they might be obligated to pay Skopi and also for demurrage resulting from the delay in discharging at Tampa. In addition, Italmare filed a counterclaim against Skopi for damages incurred as a result of Skopi's breach of the time charter. Montedison also filed a cross-claim against Italmare for indemnity.

Nitram's motion for summary judgment against Skopi on the issue of liability was granted on October 18, 1974, reserving the issue of damages for trial. The issues of the damages Nitram was entitled to receive from Skopi and the liability of the third party defendants to Skopi and to each other were tried before the court on May 27, 28 and 29, 1975.

On February 3, 1976, the district court entered final judgment in the case. Nitram was granted damages against Skopi for extraordinary discharging expenses and for cargo shortage.[5] The judgment resolved the issues of third-party liability in the following manner: Skopi was granted full indemnity against Italmare and Montedison

---

4. The discharging stevedore, Eller and Company, intervened as plaintiff against each of the parties, seeking recovery for unpaid stevedoring service. Judgment was entered against Eller on the basis of a prior accord and satisfaction.

5. The damages were apportioned as follows:

| | | |
|---|---|---|
| 1. | Excess loading, hauling and storage costs | $66,791.59 |
| 2. | Excess discharge costs | 32,416.72 |
| 3. | Cargo shortage | 39,613.98 |
| | TOTAL | $138,822.29 |

for all damages owed to Nitram, thus denying Italmare's counterclaim against Skopi; Montedison was granted recovery on its cross-claim against Italmare for liability resulting from extraordinary discharging expenses; Italmare's cross-claim against Montedison was granted for that portion of the damages relating to the cargo shortage. Finally, Skopi was awarded attorney's fees and costs against Montedison and Italmare for having to defend against Nitram's claims; the costs and attorney's fees owed Skopi were to be borne "in proportion to the final application of ultimate responsibility for the loss between Montedison and [Italmare]." This appeal ensued.[6]

## II. SKOPI'S CLAIM AGAINST ITALMARE

Italmare contends that it should not be liable over to Skopi for any damages owed Nitram because Skopi breached certain duties running to Italmare under the time charter. Specifically, Italmare complains of the Master's failure to place available dunnage in the ship's cargo holds and his failure to supervise the stowage carefully.

Relying on Clauses[7] 2, 8 and 57 of the time charter, Italmare argues that Skopi breached its duty to provide assistance in placing dunnage in the cargo holds when the Master refused Italmare's request for the crew's help in doing so. Furthermore, Italmare maintains that the Master breached his duty carefully to supervise loading

and stowing by failing to slow the mechanical loading process and take corrective measures in the cargo holds to prevent further damage to the cargo. Loading at Porto Marghera was completed approximately three days ahead of the schedule time allotted by the voyage charter; Italmare suggests that the Master could have used this extra time to stop the loading process, lay down the available dunnage, and then proceed with loading at a slower pace.

■ The district court excused the Master's actions on both counts. First, Clause 2 of the time charter clearly provided that Italmare was to provide the necessary dunnage. Contrary to this provision in the time charter, Italmare entered into a voyage charter with Montedison which specified that the vessel was to be cargo battens fitted, or in lieu thereof, dunnage boards were to be laid down.[8] Regardless of whether the Master's duty, as provided for in Clause 8,[9] to render customary assistance with the ship's crew would encompass Italmare's request for assistance in laying down dunnage, the district court found that the voyage charter was not received by the Master until the day after loading had begun; at that point in time, it was simply too late to place the dunnage in the ship's holds. In regard to the Master's competency in supervising loading, the district court found that the Master was initially very diligent in his duties: on January 15, 1974, in a letter to Italmare's agent, Captain Zabouinis warned that the ship's cargo holds were inadequately prepared to accept cargo

6. Neither Nitram nor Eller and Company are parties to this appeal.

7. Clause 2 provides, in pertinent part:
   Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, but Owners to allow them the use of any dunnage and shifting boards already aboard vessel.
   Clause 8 provides:
   That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and boats. The Captain (although appointed by the Owners) shall be under the orders and

directions of the Charterers as regards employment and agency; and Charterers are to load, stow, and trim and discharge the cargo at their expense under the supervision of the Captain, who is to sign Bills of Lading for cargo as presented, in conformity with Mate's or Tally Clerk's receipts.
   Clause 57 provides, in pertinent part:
   It is understood that the Master will supervise the stowage of the cargo very carefully.

8. See text preceding footnote 1, *supra.*

9. See note 7, *supra.*

and that damage to the cargo might arise due to the absence of dunnage or protective nylon. In later letters, Zabouinis alerted Italmare to the rapidity of the loading process and the problems it was causing with ruptured bags. The district court found that Captain Zabouinis was told "not to worry" about the consequences of the loading and was supplied with only one roll of nylon to cover the interior walls of the holds to protect the cargo in lieu of dunnage and cargo battens. Under these circumstances, the district court felt that the Master's actions were completely reasonable and did not in any way breach any duties owed Italmare under the time charter. We find the district court's findings to be supported by substantial evidence and therefore we uphold them as not clearly erroneous. *See* Fed.R.Civ.P. 52(a).

Even if the Master had breached any duties owed Italmare under the time charter, Skopi could not be held responsible for Captain Zabouinis' actions because decisions made by the Master with respect to cargo handling are decisions for which the charterer is generally responsible. Clause 8 of the time charter provides:

> The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and agency; and Charterers are to load, stow and trim and discharge the cargo at their expense under the supervision of the Captain . . . .

The test to be employed in determining whether the charterer or the shipowner is to be held responsible for the Master's decisions regarding stowage was set forth by this Court in *Horn v. CIA de Navegacion Fruco,* 404 F.2d 422 (5th Cir. 1968), *cert. denied,* 394 U.S. 943, 89 S.Ct. 1272, 22

L.Ed.2d 477 (1969). In construing Clause 8, we held:

> The Captain occupies a dual role with regard to such decisions. He acts for the shipowner where his stowage decisions are made with regard to the seaworthiness and safety of the vessel; he acts for the cargo owner where his decisions do not affect the seaworthiness or safety of the vessel, but affect the safety of the cargo only.

404 F.2d at 433 (citations omitted).

Here, any decisions made by the Master with respect to cargo handling clearly[10] related only to the safety of the cargo. Consequently, any responsibility for negligent loading or stowage as between Skopi and Italmare must lie at Italmare's feet. *See Fernandez v. Chicos Shipping Co.,* 542 F.2d 145, 151–53 (2d Cir. 1976); *Dempsey & Associates v. S. S. Sea Star,* 461 F.2d 1009 (2d Cir. 1972); *Nichimen Co. v. M. V. Farland,* 462 F.2d 319, 331–34 (2d Cir. 1972); 2B *Benedict on Admiralty* § 4 at pp. 1–31 through 1–32 (7th ed. 1978).

Italmare contends that our decision in *Horn* calls for a different result. In *Horn* the faulty stowage of banana cartons resulted in improper ventilation, causing damage to the bananas. Although the decisions of the Captain in *Horn* were consistent with those dealing with the safety of the cargo only, thus limiting the liability of the shipowner, the Court nonetheless held that the Captain's decisions related to the seaworthiness of the vessel because the stowage decisions affected the capacity of the vessel to transport the cargo as required by the charter party.

We do not reach a similar conclusion here. Any decision made in this case pertaining to the manner of loading, as it affected stowage, would obviously not impair the ability of the ship to transport the

---

10. The district court's finding of fact number 20 stated:

Testimony was uncontradicted to the effect, and the Court finds that the stowage and the loading decisions of the Master did not affect the physical safety of the vessel or her ability to withstand perils of the sea on her voyage to Tampa.

CAN in the required manner.[11] Nor did the refusal of Captain Zabouinis to provide the crew's assistance in placing dunnage boards in the vessel's holds render the *Cretan Life* incapable of transporting the cargo as required by the charter party. Clause 2 of the time charter clearly specified that Skopi was not to provide dunnage or any other "extra fittings requisite for a special trade or unusual cargo."[12] We conclude that the present case does not fall within the ambit of the narrow factual situation in *Horn* and we accordingly hold that Captain Zabouinis acted on behalf of Italmare in stowing the cargo.[13]

■ Likewise, we reject Italmare's assertion that the district court erred in failing to hold Skopi responsible for the demurrage incurred as a result of the protracted discharging operations. As we have already determined, Italmare was responsible *vis-a-vis* Skopi for the damage to the cargo which caused the delay in discharging; hence, Skopi cannot be liable for the claimed demurrage.[14]

## III. THE MONTEDISON–ITALMARE CROSS–CLAIMS

Both Montedison and Italmare filed cross-claims against each other, seeking indemnity for any and all sums for which they might be liable to Skopi and for all costs, expenses and attorney's fees incurred in defending against the third-party complaint of Skopi.[15] The district court found that, as between the two parties, the responsibility for the extraordinary discharging expenses was Italmare's; Montedison was held liable for the short delivery of cargo. We discuss these two conclusions separately.

### A. *Extraordinary discharging expenses.*

Damage to the cargo resulted in prolonged discharging operations and, consequently, extraordinary discharging expenses; the proximate cause of the cargo damage was found by the district court to be an "undifferentiable mixture of the negligence of the loading stevedore Montedi-

---

11. Although Clause 12 of the time charter provided that cargo was to be adequately ventilated, the district court did not find improper ventilation to be a contributing cause of the damage to the cargo. Here, the only damage to the cargo was the rupturing of the bags and the spillage of loose CAN throughout the cargo holds.

12. See Clause 2 as fully set forth in note 7, *supra*. We take note of the fact that the voyage charter between Italmare and Montedison specified that either cargo battens or dunnage boards were to be placed in the vessel's cargo holds, but the provisions of the voyage charter could not affect the respective rights of Italmare and Skopi since the terms of the time charter govern their relationship.

13. Italmare further relies on dicta in *Horn* to the effect that a shipowner may be liable for stowage decisions relating solely to the safety of the cargo where the Master, contrary to the express wishes of the charterer, adopts a method of stowage which results in damage to the cargo. *See* 404 F.2d at 433 n. 14. Whether this dicta represents the law of this Circuit is a question we do not decide at this time, for we are not confronted with a situation envisioned

by the dicta in *Horn*. Captain Zabouinis specifically objected to the method of loading and the absence of dunnage, but was told by Italmare's agent not to worry about the consequences of loading and stowage. See text following note 9, *supra*.

14. Italmare also brings to our attention ten separate power failures occurring on the vessel during the seventeen-day discharge at Tampa. Relying on Clauses 22, 45 and 54 of the time charter, Italmare maintains that Skopi breached its duty to maintain the vessel in good working order by failing to maintain adequate power at all times. A review of the record shows that the delay caused by the power failure was an insignificant portion of the total time involved in discharging. In the absence of any showing that the minor delays induced by these power failures would have prolonged discharging beyond the time allotted for discharging had there been no damage to the cargo, we uphold the district court's rejection of the claim for demurrage on this ground as well.

15. Italmare's cross-claim against Montedison also included a claim for demurrage in the amount of $32,083.34, incurred as a result of the prolonged discharging operations.

son, lack of cargo battens and lack of properly laid dunnage in the vessel." [16]

■ Any responsibility for that portion of the cargo damage caused by the lack of cargo battens or dunnage must lie with Italmare. Clause 18 of the voyage charter clearly specifies that Italmare was to supply cargo battens, or in lieu thereof, to lay down dunnage boards; yet Italmare failed to install either one of these cargo-securing devices.

■ With respect to the cargo damage caused by negligent loading, Montedison would appear to be liable were it not for Clause 19 of the voyage charter, which clearly imposes liability for Montedison's negligent stowage upon Italmare:

Cargo to be loaded and stowed free of risk and expenses to the vessel by Charterers' stevedores at the average rate of 1250 metric tons per weather working day of 24 consecutive hours, Sundays and Holidays excluded, unless used. Stevedores and labour to load and stow cargo under Master's control and direction and to be considered as Owners' servants. Any responsability [sic] whatsoever resulting from negligence, error in judgment and bad stowage to be for Owners' liability.

Italmare is not so quick to agree. Instead, it argues that although the latter two sentences of Clause 19 seem to impose responsibility upon it for bad stowage, the phrase "free of risk and expenses to the vessel" in the first sentence tends to shift responsibility to Montedison. This inconsistency, it is urged, renders Clause 19 ambiguous and therefore the actions of the parties should be examined to resolve this ambiguity; Italmare suggests that the actual operations of the parties under the voyage charter show that Montedison was responsible for loading and stowage.

■ Italmare's argument is flawed in two respects. First, it is not altogether clear that the first sentence of Clause 19 shifts responsibility to Montedison. As the district court concluded, the first sentence is primarily a reference to demurrage [17] and is otherwise consistent with the FIOS (free in and out stowage) nature of the voyage charter arrangements.[18] But even if Italmare were correct in its assertion that the sentence seems to shift responsibility to Montedison, we fail to find an ambiguity when the first sentence is viewed in the context of the entire charter party.[19] We must construe a charter "according to the intent of the parties as manifested by the whole instrument rather than by the literal meaning of any particular clause taken by itself." *The Framlington Court*, 69 F.2d 300, 303 (5th Cir.), *cert. denied*, 292 U.S.

---

**16.** We reject any suggestion that this finding is clearly erroneous. The testimony at trial uniformly attributed the cargo damage to a combination of negligent loading by Montedison and the lack of cargo battens or dunnage.

**17.** *See* G. Gilmore & C. Black, *The Law of Admiralty* § 4–8 at 210–15 (2d ed. 1975).

**18.** The term FIOS (free in and out stowage) simply means that the vessel does not pay for the costs of loading, stowage or discharge. *See Waterman Steamship Corp. v. United States*, 595 F.2d 91 (2d Cir. 1979); *Atlas Assurance Co. v. Harper, Robinson Shipping Co.*, 508 F.2d 1381 (9th Cir. 1975); *Sucrest Corp. v. M/V Jennifer*, 455 F.Supp. 371 (D. Maine 1978); J. Bes, *Chartering and Shipping Terms* 46–47 (7th ed. 1970). The proviso in Clause 19 that loading and stowage were to be accomplished "free of risk and expenses to the vessel" conforms to the FIOS nature of this voyage charter.

**19.** Italmare relies on two cases to suggest that the phrase "free of risk and expenses to the vessel" shifts responsibility for negligent loading to Montedison, both of which are clearly distinguishable. The dicta in *Cooper Stevedoring v. Pappadakis*, 363 F.2d 352 (5th Cir. 1966), that the phrase *may* have the effect of limiting the shipowner's liability for cargo handling certainly does not compel the conclusion that in the context of the present case it does so. *North American Steel Products Co. v. Andros Mentor*, 1969 A.M.C. 1482 (S.D.N.Y.1967), held that a similar phrase limited the liability of the shipowner, but there the court noted that the "[o]ther portions of the voyage charter make it clear that the vessel interests would not be responsible for damage to cargo except that caused by the lack of the owner's diligence in making the vessel seaworthy." *Id.* at 1493.

651, 54 S.Ct. 860, 78 L.Ed. 1500 (1934). *See Carver's Carriage by Sea* ¶ 525 (12th ed. 1971).

The remaining sentences of Clause 19 make it perfectly clear that Montedison's stevedores were to be considered as Italmare's servants and that "any responsability [sic] whatsoever" for "negligence, error in judgement and bad stowage" would be borne by Italmare. Moreover, Clause 9 of the voyage charter, a standard clause of the GENCON form charter, was carefully edited by the parties so as to place responsibility for cargo damage on Italmare.[20] Deleted from Clause 9 was the proviso that would have exonerated Italmare if the loading was performed by Montedison; excised as well was the second paragraph of the clause, which would have relieved Italmare from liability for cargo damage due to negligence of the Captain or crew or the unseaworthiness of the vessel. When Clauses 9 and 19 are read in the context of the charter party as a whole, it clearly appears that Italmare has contractually undertaken to be liable for the damaged cargo, whether the negligence which caused the damage was its own or that of Montedison.[21] Thus, the trial court correctly held Italmare responsible for the extraordinary discharging expenses, including demurrage,[22] caused by the damage to the cargo.

### B. Cargo Shortage.

Based primarily on Nitram's records, the district court found that Montedison had

---

20. The bracketed portions of Clause 9, the Owner's Responsibility Clause, were crossed out by the parties:

Owners are to be responsible for loss of or damage to the goods or for delay in delivery of the goods only in case the loss, damage or delay has been caused by the improper or negligent stowage of the goods [(unless stowage performed by shippers or their stevedores or servants)] or by [personal] want of due diligence on the part of the Owners or their Manager to make the vessel in all respects seaworthy and to secure that she is properly manned, equipped and supplied or by [the personal] act or default of the Owners or their Manager.

[And the Owners are responsible for no loss or damage or delay arising from any other cause whatsoever, even from the neglect or default of the Captain or crew or some other person employed by the Owners on board or ashore for whose acts they would, but for this clause, be responsible, or from unseaworthiness of the vessel on loading or commencement of the voyage or at any time whatsoever.]

Damage caused by contact with or leakage, smell or evaporation from other goods or by the inflammable or explosive nature or insufficient package of other goods not to be considered or caused by improper or negligent stowage, even if in fact so caused.

21. Italmare argues that to give such an effect to Clauses 9 and 19 is to require it to indemnify Montedison against the consequences of its own negligence, a result which runs contrary to the established principle that such an intention must be unequivocally expressed in the plainest of terms. *See Lanasse v. Travelers Insurance Co.*, 450 F.2d 580, 583 (5th Cir. 1971),

cert. *denied*, 406 U.S. 921, 92 S.Ct. 1779, 32 L.Ed.2d 120 (1972); *Seaboard Coast Line R.R. v. Tennessee Corp.*, 421 F.2d 970, 973 (5th Cir.), cert. *denied*, 398 U.S. 928, 90 S.Ct. 1819, 26 L.Ed.2d 91 (1970); *Grigsby v. Coastal Marine Service of Texas, Inc.*, 412 F.2d 1011, 1039 (5th Cir. 1969), cert. *denied*, 396 U.S. 1033, 90 S.Ct. 612, 24 L.Ed.2d 531 (1970); *Batson-Cook Co. v. Industrial Steel Erectors*, 257 F.2d 410, 412 (5th Cir. 1958). As our prior discussion concerning these clauses should indicate, we do not agree; it is doubtful that Italmare's intent to indemnify Montedison could be any clearer. Clause 19 specifies that Montedison's stevedores will be considered as Italmare's servants and that Italmare will assume *any responsibility whatsoever* for "negligence, error in judgement and bad stowage." The assumption of "any responsability [sic] whatsoever" shows in unmistakable terms the promise to indemnify and the treatment of Montedison's stevedore as employees of Italmare plainly shows the commitment to indemnify against the negligence of Montedison's stevedores. The only provision which would have relieved Italmare from the responsibility for Montedison's negligence was struck from Clause 9. See note 20 and accompanying text, *supra*. In short, we find an unequivocal intention by Italmare to indemnify Montedison against the consequences of its own negligence. *See Brown v. Seaboard Coast Line R.R.*, 554 F.2d 1299 (5th Cir. 1977), cert. *denied*, 434 U.S. 975, 98 S.Ct. 533, 54 L.Ed.2d 467.

22. Because Italmare is liable for the cargo damage which delayed discharging and resulted in extraordinary discharging expenses, its claim against Montedison for demurrage must also fail.

failed to deliver the proper number of bags of CAN to the vessel, and granted Italmare indemnity against Montedison for damages due to short delivery. We agree with the district court that Montedison bears the responsibility for any shortage. Section 3(5) of the Carriage of Goods by Sea Act (COGSA), 46 U.S.C.A. § 1303(5), states that the shipper shall be deemed to have guaranteed to the carrier the accuracy of the count as furnished by the shipper, and shall indemnify the carrier against any damages arising from inaccuracies in the count. Skopi and Italmare relied on the count furnished by Montedison and accordingly should be indemnified for the damages incurred as a result of the inaccuracies of such count.

Montedison does not agree, and although conceding that the guarantee runs to Skopi, argues that Italmare is not a "carrier" within the meaning of Section 3(5). We refuse to construe Section 3(5) in such a restrictive fashion.

■ The term "carrier" is defined in Section 1 of COGSA, 46 U.S.C.A. § 1301.[23] As the use of the word "includes" suggests, the definition provided is not exhaustive. Even so, Italmare has entered into a contract of carriage with Montedison for the carriage of goods covered by a bill of lading, and as such, is a "carrier" as defined in Section 1.[24] *See Carver's Carriage by Sea* ¶ 233 (12th ed. 1971).

■ Our conclusion that Italmare is a "carrier" within the meaning of Section 3(5) also comports with the general purpose of Section 3 of COGSA. Under Section 3(3) of COGSA, 46 U.S.C.A. § 1303(3), the shipper, Montedison, has the statutory right to demand a bill of lading showing the number of pieces of cargo loaded as being the number furnished to the carrier by the shipper; in return for this right, the shipper is presumed, in accordance with the provisions of Section 3(5),[25] to have guaranteed to the carrier the accuracy of the count so furnished. A shipper may not take advantage of the broad statutory right to demand a bill of lading unless he is willing to categorically stand by the accuracy of the count he furnishes. Moreover, this guarantee is impliedly given in exchange for the right to demand a bill of lading from either the

**23.** Section 1 provides, in pertinent part:
When used in this chapter—
(a) The term "carrier" includes the owner or the charterer who enters into a contract of carriage with a shipper.
(b) The term "contract of carriage" applies only to contracts of carriage covered by a bill of lading or any similar document of title, insofar as such document relates to the carriage of goods by sea, including any bill of lading or any similar document as aforesaid issued under or pursuant to a charter party from the moment at which such bill of lading or similar document of title regulates the relations between a carrier and a holder of the same.

**24.** We are not compelled to reach a different conclusion by the decision relied upon by Montedison, *Southern Block & Pipe Corp. v. M/V Adonis*, 341 F.Supp. 879 (E.D.Va.1970), aff'd, 457 F.2d 924 (4th Cir. 1972). There the court simply held that the shipowner was the carrier *vis-a-vis* the plaintiff, receiver of the goods, and was accordingly subject to the responsibilities and liabilities imposed under Section 3 of COGSA. That result was necessitated by the fact that the plaintiff, as indorsee of the bill of lading, had entered into a contractual

relationship with the shipowner by virtue of the contract deemed to be contained in the bill of lading. *See Scrutton on Charterparties and Bills of Lading* Art. 32 at 60 (18th ed. 1974); *Carver's Carriage by Sea* ¶ 273 (12th ed. 1971). Here, of course, we are faced with a charterer, Italmare, who has entered into a contract of carriage with a shipper, Montedison. As between these two parties, Italmare assumes the position of the statutory carrier and is entitled to the guarantee of the accuracy of the count furnished by Montedison.

**25.** Section 3(5) of COGSA, 46 U.S.C.A. § 1303(5), provides:
The shipper shall be deemed to have guaranteed to the carrier the accuracy at the time of shipment of the marks, number, quantity, and weight, as furnished by him; and the shipper shall indemnify the carrier against all loss, damages, and expenses arising or resulting from inaccuracies in such particulars. The right of the carrier to such indemnity shall in no way limit his responsibility and liability under the contract of carriage to any person other than the shipper.

carrier, master, or agent of the carrier, as provided for in Section 3(3) of COGSA, 46 U.S.C.A. § 1303(3). *See Carver's Carriage by Sea* ¶ 273 (12th ed. 1971). Thus, even if we were to assume that Italmare was not a "carrier," it was nonetheless obligated, as an agent,[26] to issue a bill of lading on demand and is therefore entitled to the benefit of the presumptive guarantee contained in Section 3(5). Surely responsibility for the inaccuracies in the count supplied by Montedison cannot rest with Italmare. This result is particularly appropriate in cases such as the present one, where the party seeking the benefit of the guarantee has been held liable for the shortage.[27]

■ Montedison challenges the conclusion that it should be held responsible for the shortage, relying on Clause 32 of the voyage charter:

> Tallying at loading and discharging ports to be at Master's responsability [sic] and Master to be responsible for the number of bags loaded and to recognize same in Bills of Lading, which shall be marked "GOODS ACTUALLY ON BOARD" and "WITHOUT TRANSHIPMENT."

Montedison argues that Clause 32 constitutes a waiver of the Section 3(5) guarantee by Italmare.[28] But this contention misconstrues the basic thrust of Clause 32, which is, at most, a contractual undertaking by Italmare to tally the bags of CAN at loading; nowhere in Clause 32 do the parties negate the effect of the statutory guarantee as to the accuracy of any count furnished by Montedison. The failure of Italmare to tally the bags might give Montedison a damage claim for breach of contract, but such failure would not relieve Montedison from its statutory duty to guarantee the accuracy of the count it chooses to furnish.

■ Furthermore, the district court concluded that although Italmare had agreed in Clause 32 to be responsible for tallying, it was prevented from doing so by the rapidity of the loading process. We agree. It is a general principle of contract law that if one party to a contract prevents or makes impossible performance by the other party, the latter's failure to perform will be excused and the offending party will not be permitted to recover damages for nonperformance. *Owens v. William H. Banks Warehouses, Inc.*, 202 F.2d 689, 692 (5th Cir.), *cert. denied*, 346 U.S. 813, 74 S.Ct. 22, 98 L.Ed. 341 (1953); L. Simpson, *Handbook of the Law of Contracts* § 183 (2d ed. 1965). But this principle has no application when the party whose performance was prevented entered into the contract fully aware of the obstacles which would prevent his performance. 202 F.2d at 692. Montedison argues that Italmare cannot claim it was hindered in performing its duty to tally the CAN by the rapidity of the loading process since it had loaded shipments of fertilizer on prior occasions at Porto Marghera and was therefore thoroughly familiar with the loading process when it signed the voyage charter. Moreover, Montedison claims that under Clause 19 the Master had the power to control loading and therefore could have slowed the speed of loading to make counting more feasible.

---

26. Clause 43 of the time charter party authorizes Italmare to sign bills of lading and even requires Italmare to indemnify Skopi for any losses arising when one of Italmare's agents signs the bill of lading in question:

> It is understood that the Master will authorize in writing the Charterers or their Agents to sign Bills of Lading on his behalf according to mate's receipts. Owners not to be responsible for any consequences that may arise out of this authority. Charterers to indemnify Owners if any dispute arises under this clause regarding claims of Shippers/Receivers/Stevedores or [sic] quantity/quality of any cargo carried under Bills of Lading signed by Agents authorized by Master.

Our conclusion that Italmare is entitled to the benefit of Montedison's guarantee as to the accuracy of the count is not altered by the fact that the Master rather than Italmare signed the bill of lading in the present case.

27. Italmare, as was Montedison, was held liable over to Skopi for the damages for the cargo shortage as well as the extraordinary discharging expenses.

28. See 46 U.S.C.A. §§ 1303(8), 1305.

The district court ultimately rejected these assertions, finding that the speed of loading effectively prevented Italmare from making an accurate tally. We are, of course, bound by the trial court's findings unless we find them to be clearly erroneous. After carefully reviewing the record, we conclude that the district court's finding is supported by the evidence and therefore not clearly erroneous. Although the Master and his crew had loaded fertilizer on prior occasions at Montedison's facilities, there is no indication in the record that he or Italmare or any of its agents were aware of prior instances of fast loading or were even familiar with the mechanical loading process. Indeed, as the January 21, 1974, letter of protest shows, the Captain seemed quite surprised by the rapidity of loading. And despite the Master's "control" over loading operations under Clause 19, the testimony clearly shows that only the loading superintendent of Montedison could regulate the speed of loading. As a factual matter, then, we uphold the district court's conclusion that Montedison prevented Italmare from tallying the cargo at loading.[29]

In conclusion, we uphold the district court's determination that Italmare bears the responsibility for extraordinary discharging expenses and that Montedison must be responsible for the cargo shortage.[30]

## IV. SKOPI'S CLAIM AGAINST MONTEDISON

Montedison advances several arguments in support of its contention that it should not be liable over to Skopi for the damages owed Nitram. First, Montedison argues that it cannot be liable for the cargo shortage because the Master signed the bill of lading showing that 245,000 bags of CAN, the amount purchased by Nitram, had been loaded on board. Relying on Section 3(4) of COGSA, 46 U.S.C.A. § 1303(4),[31] Montedison argues that the bill of lading constitutes prima facie evidence that the full amount of CAN was loaded on board. The district court held that Montedison was liable for the shortage because under Section 3(5) of COGSA, 46 U.S.C.A. § 1303(5), Skopi was entitled to indemnity from Montedison for the damages incurred as a result of the inaccurate count supplied by the latter. Although the district court found that, as between Skopi and Nitram, the prima facie effect of the bill of lading was not overcome, it obviously felt that Montedison was not entitled to the prima facie effect of the bill of lading because the guarantee contained in Section 3(5) of COGSA is controlling. We agree, for to accept Montedison's argument that it was entitled to benefit from the prima facie effect of the bill of lading would effectively read Section 3(5) out of the statute.

---

29. Italmare also relies on Clause 14 of the voyage charter, which provides for indemnity, presumably to either party, for nonperformance of the charter party. In view of our conclusion that Montedison prevented Italmare from counting the bags, Montedison obviously cannot seek indemnity under Clause 14 for Italmare's failure to tally the cargo pursuant to Clause 32.

30. In the district court both Montedison and Italmare, in conjunction with their demands for full indemnity against each other, requested attorney's fees and expenses for having to defend against the third party complaint of Skopi. The district court refused to grant complete indemnity in favor of either party and therefore left each party to bear its own fees and expenses. It is clear that neither party is entitled to attorney's fees and expenses for prosecuting or defending their respective cross-claims. *Lusich v. Bloomfield Steamship Co.,* 355 F.2d 770,

776 (5th Cir. 1966). And in view of the fact that neither party was entitled to complete indemnity against the other, we find that the district court properly exercised its discretion in failing to award attorney's fees and expenses. *See Lagarde Finance Co. v. Vinet,* 346 F.2d 846, 852 (5th Cir. 1965); *Schirmer Stevedoring Co. v. Seaboard Stevedoring Corp.,* 306 F.2d 188 (9th Cir. 1962); Fed.R.Civ.P. 54(d).

31. 46 U.S.C.A. § 1303(4) provides:
 (4) Such a bill of lading shall be prima facie evidence of the receipt by the carrier of the goods as therein described in accordance with paragraphs (3)(a), (b), and (c), of this section: Provided, That nothing in this chapter shall be construed as repealing or limiting the application of any part of sections 81 to 124 of Title 49.

COGSA was intended to function as a code of regulations primarily governing the "rights and responsibilities, liabilities and immunities arising out of the relation of *issuer to holder* of the bill of lading, with respect to goods damage or loss." G. Gilmore & C. Black, *The Law of Admiralty* § 3–25 at 145 (2d ed. 1974) (emphasis added). To enforce their respective rights under the Act, litigants must engage in the ping-pong game of burden-shifting mandated by Sections 3 and 4. The plaintiff serves, and must establish a prima facie case by proving both delivery of the goods to the carrier in good condition and outturn by the carrier in damaged condition. The ball is now in the carrier's court; he bears the burden of showing that the loss or damage falls within one of the COGSA exceptions set forth in 46 U.S.C.A. § 1304(2). Once that burden is satisfied, the burden shifts back to the plaintiff to show that the carrier's negligence contributed to the damage or loss. Once again, and for the final time, the burden then shifts to the carrier to segregate the portion of the damage due to the excepted cause from that portion resulting from its own negligence. With the volley thus complete, the trial judge must ultimately apportion responsibility for the loss or damage so proven.[32]

Section 3(4) of COGSA comes into play as part of the plaintiff's initial burden of establishing a prima facie case. Thus, the bill of lading constitutes prima facie evidence that the carrier received the goods as described therein. *Emmco Insur-*

ance Co. v. Wallenius Caribbean Line, 492 F.2d 508 (5th Cir. 1974); *Cummins Sales & Service, Inc. v. London & Overseas Insurance Co.*, 476 F.2d 498 (5th Cir.), *cert. denied*, 414 U.S. 1003, 94 S.Ct. 359, 38 L.Ed.2d 239 (1973); *Yeckes-Eichenbaum, Inc. v. Texas Mexican Railway Co.*, 263 F.2d 791 (5th Cir.), *cert. denied*, 361 U.S. 827, 80 S.Ct. 75, 4 L.Ed.2d 70 (1959); *Spanish American Skin Co. v. The Ferngulf*, 242 F.2d 551 (2d Cir. 1957). But only the *innocent transferee* of the bill of lading is entitled to benefit from its prima facie effect. *Sucrest Corp. v. M/V Jennifer*, 455 F.Supp. 371 (D.Maine 1978); G. Gilmore & C. Black, *The Law of Admiralty* §§ 3–25, 4–10 (2d ed. 1974); *Scrutton on Charterparties and Bills of Lading* 426 (18th ed. 1974). As between *the carrier and the shipper who supplies the count*[33] and thereby obtains the bill of lading, the carrier is entitled to the guaranteed accuracy of the count as specified in Section 3(5), and the carrier is not estopped from challenging the count contained in the bill of lading as being inaccurate. *See Atlantic Overseas Corp. v. Feder*, 452 F.Supp. 347, 350 (S.D.N.Y.1978); *Spanish-American Skin Co. v. M.S. Ferngulf*, 143 F.Supp. 345 (S.D.N.Y.1956), *aff'd*, 242 F.2d 551 (2d Cir. 1957). As we discussed in Part III, *supra*, the guarantee contained in Section 3(5) is the statutory *quid-pro-quo* for the right of the shipper in Section 3(3) to demand a bill of lading from the carrier. If the carrier is obligated, as he was in this case, to issue a bill of lading on demand from the shipper, then the shipper must live up to his part of the bargain and guarantee the accuracy of the count supplied by him.[34] To accept

---

**32.** A more thorough explanation of the respective burdens of plaintiff and defendant may be found in *Vana Trading Co. v. S.S. Mette Skou*, 556 F.2d 100 (2d Cir. 1977), *cert. denied*, 434 U.S. 892, 98 S.Ct. 267, 54 L.Ed.2d 177; *Cummins Sales & Service, Inc. v. London & Overseas Insurance Co.*, 476 F.2d 498 (5th Cir.), *cert. denied*, 414 U.S. 1003, 94 S.Ct. 359, 38 L.Ed.2d 239 (1973); *Daido Line v. Thomas P. Gonzalez Corp.*, 299 F.2d 669 (9th Cir. 1962); G. Gilmore & C. Black, *The Law of Admiralty* § 3–43 (2d ed. 1974).

**33.** We do not find the Second Circuit's opinion in *American Trading Co. v. The Harry Culbreath*, 187 F.2d 310 (2d Cir. 1951), to be apposite to the present case. In that case the count was found not to have been supplied by the shipper and so the guarantee of Section 3(5) was obviously inapplicable.

**34.** Montedison points out that under Section 3(3)(c) of COGSA, 46 U.S.C.A. § 1303(3)(c), Italmare had the right to refuse to sign the bill of lading if it had reasonable grounds for sus-

Montedison's argument that the guaranteed accuracy of the count is supplanted by the prima facie effect of the bill of lading would render Section 3(5) meaningless. We refuse to countenance such a result.[35]

Second, Montedison challenges the district court's finding that there was a short delivery to the vessel.[36] Based on Nitram's records of the amount of CAN eventually shipped out to its customers and the discharging stevedore's tally, the district court found that there was a shortage of cargo upon discharge. Nitram's records show that it shipped out a total of 13,143.38 short tons of CAN, 359.80 short tons less than the amount it purchased. The discharging stevedore's tally shows that approximately 4,500 bags of CAN were missing. Faced with such convincing evidence of a shortage at discharge, the district court concluded that there was a short delivery to the vessel.

■■■ Montedison attempts to discredit the finding of a shortage at discharge, but its argument suffers from an unwarranted assumption. The discharging stevedore's records show that 267 short tons of bulk CAN were discharged in addition to the 240,500 bags counted upon discharge. Assuming that all bags counted were full, Montedison adds the bulk discharge weight to the weight of 240,500 bags of CAN and

concludes that Nitram actually received more than the 13,503.18 short tons it purchased. The problem with this calculation, however, is that the cargo surveyor's report, as well as the other evidence in the record, clearly shows that the discharging stevedore counted *all bags* as full ones, including torn, slack and near-empty bags. In fact, the cargo surveyor's report concludes that the loose CAN remaining in the vessel's holds constituted spillage from the torn bags. Because there is more than ample evidence in the record to support the district court's findings, we uphold the conclusion that there was a short delivery to the vessel based upon the clear evidence of a shortage at discharge.

Although we agree with the district court that there was a short delivery, we are left with the definite and firm conviction that a mistake has been committed in calculating the amount of shortage. *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948). Montedison points out that Nitram's records showing the amount shipped out to its customers are based upon net weight,[37] whereas the amount it purchased was in gross weight. Thus, Nitram's records overestimate the shortage by an amount equal to the weight of the bags. It has also come to our attention that a portion of the 359.80 ton shortage may be attributed to loose

pecting the accuracy of the count. Although this is true, the signing of the bill of lading in the face of a doubt as to the accuracy of the count does not negate the guarantee contained in Section 3(5), but only serves to prejudice the carrier *vis-a-vis* an innocent transferee of the bill of lading. If the carrier had wished to avoid liability to transferees of the bill of lading, it could have legitimately refused to sign the bill; *failing to do so, however, it became liable to Nitram for the amount contained in the bill.*

35. Montedison brings to our attention that the contract of sale for the CAN was upon C & F terms. We are not altogether clear as to the import of this argument, but we are certain that the C & F term merely allocates the risk of loss of goods in transit as between the buyer and seller and therefore would have no bearing on the issue of whether Montedison must in-

demnify Skopi for the cargo shortage. *See Cummins Sales & Service, Inc. v. London & Overseas Insurance Co.,* 476 F.2d 498 (5th Cir.), *cert. denied,* 414 U.S. 1003, 94 S.Ct. 359, 38 L.Ed.2d 239 (1973).

36. We reject without discussion Skopi's assertion that Montedison cannot challenge the district court's finding of short delivery.

37. This assertion is not entirely correct, since a small portion of the CAN shipped from Nitram's warehouses was shipped in bags. However, from our review of the record, it appears that most of the CAN shipped to Nitram's customers was in bulk. The district court upon remand should determine that portion of the CAN shipped by Nitram in bulk and deduct an appropriate amount from the cargo shortage of 359.80 tons to account for the weight of the bags.

CAN which was either left in the vessel's holds or lost in transit between dockside and Nitram's warehouses. Because any loose CAN lost in this manner resulted from the torn condition of the bags, Italmare must be liable for such amounts since it is responsible for the negligent loading which caused the spillage. Thus, we reverse the district court's determination of the amount of short delivery and remand for the limited purpose of reducing that figure by an amount equalling the weight of the bags not included in Nitram's shipping records. Also, that portion of the shortage attributable to loose CAN lost in the vessel's holds or in transit should be deducted from the short delivery damages assessed against Montedison and should be included as part of the damages assessed against Italmare.

 Finally, Montedison attempts to avoid liability for the cargo shortage by relying on Clause 32 of the voyage charter, which it claims was incorporated into the Bill of Lading.[38] To the extent that Clause 32 imposes liability for the shortage upon Skopi, it is repugnant to the shipper's guarantee found in Section 3(5) of COGSA and expressly incorporated into the bill of lading. The bill specifically provides that any provision contained therein is void to the extent that it conflicts with the provisions of COGSA. Thus, assuming that Clause 32 was incorporated into the bill of lading, it had no effect because it conflicted with Section 3(5). Moreover, Skopi would be excused from complying with Clause 32 in view of our prior determination that the rapidity of the mechanical loading process prevented tallying the cargo.

To summarize, we agree with the district court that Skopi is entitled to indemnity

38. The Bill of Lading provides that "All the terms, conditons, [sic] liberties, and exceptions of the Charter-Party are herewith incorporated."

39. Montedison does not contest its liability in indemnity to Skopi caused by its negligent stevedoring. See Robert C. Herd & Co. v. Krawill Machinery Corp., 359 U.S. 297, 79 S.Ct. 766, 3 L.Ed.2d 820 (1959); Centraal Stikstof Verkoopkanter v. Walsh Stevedoring Co., 380

from Montedison for the cargo shortage due to short delivery,[39] but we reverse the district court's determination as to the amount of shortage and remand for a recalculation in accordance with the instructions contained in this opinion.

AFFIRMED in part; REVERSED and REMANDED in part.

F.2d 523 (5th Cir. 1967). Instead, Montedison attempts to escape responsibility by arguing for the first time in its reply brief that Clause 19 was incorporated into the bill of lading. Assuming arguendo that Clause 19 was incorporated, it is clear that the clause imposes liability for negligent loading solely on the "Owner," which in the context of the entire charter party can only be taken to refer to Italmare.